STATE OF NEBRASKA, APPELLEE, V. CHARLES T. HOUSER, APPELLANT.

490 N.W.2d 168

Filed September 25, 1992.    No. S-90-373.

Michael Poepsel and, on brief, Donald W. Kleine, of Kleine Law Office, for appellant.

Don Stenberg, Attorney General, and Marie C. Pawol for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ.

GRANT, J.

Defendant, Charles T. Houser, was charged with first degree

murder in the death of Janice Ross Patterson. After a jury trial, defendant was found guilty of second degree murder. He was sentenced to serve 27 years in prison, with credit given for 497 days served in jail prior to sentencing.

Defendant timely appealed and in this court assigns six errors. In view of the fact that we determine that the cause must be remanded for a new trial in connection with the reception of deoxyribonucleic acid (DNA) evidence, we will discuss only the assignments of error which present problems that will arise on the retrial. Other assignments, concerning matters which will not arise on retrial, will not be discussed herein. In the assignments of error with which we are concerned, defendant alleges that the trial court erred (1) in overruling his motion to suppress evidence obtained in a search of defendant's residence, (2) in admitting identification evidence based on a suggestive photographic array, (3) in overruling defendant's motion in limine concerning "evidence of DNA fingerprinting that has not been found sufficiently acceptable or reliable to the scientific community," and (4) in later permitting that evidence to be submitted to the jury at trial.

Viewed in the light most favorable to the State, as required by *State v. Davis*, 240 Neb. 631, 483 N.W.2d 554 (1992), the record shows the following facts:

At approximately 6 p.m. on Tuesday, September 27, 1988, Omaha police officers were summoned to the house of Charles and Willie Ross to investigate a report that their daughter, 34-year-old Janice Ross Patterson, was missing and had not been seen since the evening of September 26.

At approximately 7 p.m. on September 26, Patterson left the Ross house, where she and her 15-year-old son resided, to visit her boyfriend, defendant Charles T. Houser, who lived in an apartment at 2706 North 75th Street in Omaha. At approximately 10 p.m. on the night of the 26th, defendant called the Ross home and asked to speak with Patterson. Willie Ross told defendant that Patterson was not home. Defendant told Willie Ross that Patterson had left his apartment about 2 hours earlier to go to the grocery store and to the post office downtown.

Police investigation showed that Patterson had not reported

to work on the morning of September 27 and that Patterson had not taken her son to a dental appointment on that afternoon.

On September 27, after talking to the Rosses, police went to defendant's apartment to question him. Defendant stated that Patterson had come to his apartment on September 26, that they had had dinner, and that she had left at approximately 10:30 p.m. to go to the grocery store and the post office and to return to her home.

As the officers were leaving defendant's apartment, at approximately 8:45 p.m., they were informed by other officers that Patterson's car had been discovered by Patterson's family in the No Frills grocery store parking lot at 80th and Blondo Streets in Omaha. That location is approximately four blocks from defendant's apartment. At about the same time, defendant received a phone call from Patterson's brother, who stated that Patterson's car had been found. The exterior of the car showed pieces of underbrush in the grille and in the passenger-side door. The front license plate was missing. Patterson's purse and shoes were in the car. There was a pool of blood in the trunk, which also contained an envelope, a large sheet of plastic, and a hammer, all stained with blood.

Defendant drove to the parking lot, and when he arrived police asked if they could question him. During a brief interview at the scene, defendant signed a consent form permitting police to search his car and his apartment. The search of his car revealed nothing of evidentiary value. During the search of defendant's apartment, police took into evidence a receipt from Kentucky Fried Chicken, dated September 26, 1988, at 8:45 p.m.

After the search, defendant agreed to go to the police station with the officers for further questioning. He was not given *Miranda* warnings at this time. The initial interview at the station lasted approximately 1 hour and was briefly interrupted so that the interrogating detectives, Foxall and Sklenar, could confer with their commander. The interview was resumed shortly, and the officers began by reading defendant his *Miranda* rights. In this second interview, defendant basically repeated his earlier statements that Patterson had arrived at his

apartment between 7:30 and 8 p.m., that they had bought dinner, and that she had left between 10 and 11 p.m. to go to the post office and the grocery store. He denied any involvement in Patterson's disappearance.

At that time defendant had not been advised that he was under arrest. The questioning became more direct. Interrogating officers asked if defendant had killed Patterson. At 2:17 a.m. on September 28, defendant requested an attorney. Police terminated the interview and allowed defendant to use a phone book and an office telephone. Defendant testified that he did not call an attorney because of the late hour.

Defendant was then escorted to the police criminalistics lab, where hair samples and fingernail scrapings were taken. Officer Paul Briese, who was escorting defendant, then asked defendant if he would sign a consent form authorizing a search of defendant's apartment. Briese testified he asked defendant no questions beyond requesting that defendant sign the consent-to-search form. At that time a search warrant was being prepared, and Briese so told defendant. At 4:17 a.m. defendant signed a second consent-to-search form permitting police to search his apartment, on condition that defendant be present during the search.

Defendant then accompanied police to his apartment early on the morning of September 28, but remained in the car while police conducted a 3-hour search of his apartment. There were no signs of a struggle in the apartment, which was neat and clean. Items of clothing and linen were taken into evidence, as well as two couch cushions. Upon conclusion of the search, defendant was released.

On the evening of September 28, Kelly Black, who lived on an acreage near Neola, Iowa, which is approximately 40 miles from Omaha, watched an Omaha news broadcast which reported the disappearance of Patterson. The news report pictured Patterson's car and detailed the information of her disappearance. Black recognized the car as one which he had helped pull out of a drainage ditch near his home early on Tuesday morning, September 27. Black called the Omaha police and informed them that at approximately 5 a.m. on the

27th, he had been awakened by a knock at his front door and that when he answered the door he found a black man requesting help in pulling his car from a nearby ditch. Black agreed and then spent 45 minutes assisting the man. Black stated that the man was wearing a red T-shirt and red jogging shorts.

Upon request of the police, Black went to Omaha and viewed a photo lineup of six black men. Black immediately identified a picture of defendant. Police then accompanied Black back to the location where the car had been stuck. The front license plate of Patterson's car was found there, but a search of the area did not disclose the victim's body. Later searches in the area by law enforcement officials, volunteers, and friends of the victim's family during the ensuing weeks found nothing.

The police investigation uncovered several witnesses. Several motorists traveling in Iowa on Highway 191 near Black's house on the morning of September 27 reported seeing a black man in red shorts and a red T-shirt on the highway trying to wave down cars. One witness testified that she stopped for the man, who asked for help pulling his car out of a ditch. She testified that the man looked into the backseat of her car at the driver's child, and she drove off because she was concerned. This witness, however, could not positively identify defendant as the man she saw.

Several people living in defendant's neighborhood reported seeing a black man in red shorts and a red T-shirt, between 7 and 7:15 a.m., walking north toward defendant's apartment building. This was shown to be along the most direct route from the parking lot where the car was found to defendant's apartment. Two of the witnesses identified the defendant as the man they saw that morning.

Defendant was also seen by a neighbor in the early hours of the 27th. This man told police that at approximately 4:30 a.m. he had seen the defendant in a red long-sleeved jacket entering the apartment area. He told police that later that day, defendant came up to his apartment and asked if the police had questioned the neighbor and what the neighbor remembered. The defendant then tried to convince the neighbor that they saw each other around 1 or 2 o'clock that morning and that when

the witness had seen him, defendant was wearing a blue jumpsuit. Defendant then tried to convince the neighbor that defendant was wearing camouflage clothing at the time.

On October 14, police obtained a search warrant for defendant's apartment and at this time recovered carpeting from the floor beneath the couch from which the cushions had been seized during the second search to which defendant had consented. Police later learned that the couch had been purchased new and delivered only a few days prior to Patterson's disappearance.

Testing by a Nebraska State Patrol forensic serologist of the blood from the trunk of the car and from the cushions and carpeting taken from defendant's apartment showed that the blood was type A blood, which was Patterson's blood type. Defendant has type O blood. The remainder of the bloodstained evidence, together with four teeth later removed from the victim's body, was forwarded to Lifecodes, Inc., a privately operated forensic laboratory in Westchester, New York. That company analyzes evidence for traces of DNA. DNA is a nucleic acid, found in the nuclei of living cells, that constitutes the genetic material of all cellular organisms. Dorland's Illustrated Medical Dictionary 447 (27th ed. 1988).

On November 5, 1988, approximately 6 weeks after Patterson's disappearance, volunteer searchers discovered her unclothed, mud-covered body partially concealed with brush and sticks. The body was found on the edge of a drainage ditch, near Neola, about 200 feet from the point where the license plate from Patterson's car had been found. An autopsy was performed. Dental records positively identified the victim as Patterson. The condition of the body was such that no blood or other bodily fluids remained in the body. The four teeth removed from the body were found by Lifecodes to be in such condition that they did not furnish material for effective DNA testing.

Dr. Jerry Jones, who performed the autopsy, testified that the state of decomposition suggested that the body had been there for approximately 6 weeks. He further testified that Patterson had a fractured metacarpal of the left hand, which he characterized as a "defensive injury." Patterson had a fracture

of the bone around the right eye and cheekbone. The doctor was of the opinion that this had been caused by a strong blow from a blunt instrument. He ruled out the use of a fist or a fall as the cause of the fracture. Dr. Jones also discovered two lacerations on the back of the head. These, too, evidenced blunt-force trauma. He testified, however, that due to the amount of bleeding which took place after the wounds were inflicted, none of these injuries was the cause of death.

Dr. Jones testified that hemorrhages in the neck muscles, a fractured hyoid bone in the neck, and fractured thyroid cartilage all suggested the cause of death to be manual strangulation inflicted after the injuries with the blunt object.

Blood samples from Patterson's parents were forwarded to Lifecodes for DNA testing and comparison with the blood on the carpeting removed from defendant's apartment and with the blood found in the trunk of Patterson's car. The testing by Lifecodes revealed that the DNA from the blood in the trunk and the blood found on the carpeting was consistent with DNA from a child of Charles and Willie Ross. A witness from Lifecodes testified that there was a 99.9999995 percent probability that this DNA was from a child of Charles and Willie Ross. Other evidence showed that no child of Charles and Willie Ross had deposited blood in the trunk of the car or in defendant's apartment. At trial, the defendant testified, but offered no explanation as to how his carpeting and new couch had both been stained by the blood.

In his first assignment of error, defendant asserts that the trial court erred in overruling defendant's motion to suppress evidence obtained in the search of defendant's apartment on September 28, 1988.

When reviewing a motion to suppress, an appellate court will not reweigh or resolve conflicts in the evidence, but will uphold the trial court's findings unless they are clearly erroneous. *State v. Thomas*, 240 Neb. 545, 483 N.W.2d 527 (1992); *State v. Bowen*, 232 Neb. 725, 442 N.W.2d 209 (1989); *State v. Kimminau*, 240 Neb. 176, 481 N.W.2d 183 (1992). In determining the facts at a hearing on a motion to suppress, the trial court is the trier of fact, and this court takes into consideration that the trial court has observed the witnesses.

*State v. Kimminau, supra*; *State v. Juhl*, 234 Neb. 33, 449 N.W.2d 202 (1989).

In support of his position, defendant states that while he was in custody of police, after he had been informed of his *Miranda* rights and had invoked his Sixth Amendment right to counsel, he was requested to consent to a search of his apartment. He contends that this request to search was in violation of his Fifth Amendment rights and that, as a result, evidence recovered after this consent was inadmissible. Defendant further contends that the evidence recovered in subsequent searches is also inadmissible as "fruit of the poisonous tree." See *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Defendant states that "once a defendant has invoked his right to counsel he is 'not subject to further interrogation by the authorities until counsel has been made available to him'." Brief for appellant at 15, quoting *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). Defendant further argues that the purpose of giving a person in custody his rights under the *Miranda* warning is to inform the individual in custody that he may refuse further interrogation until counsel is present.

With this latter statement we agree. In *Edwards v. Arizona*, 451 U.S. at 485, the Supreme Court stated, "[I]t is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."

The question before this court on that issue is whether requesting defendant to execute a consent-to-search form after defendant has requested counsel constituted further interrogation in violation of defendant's rights. Defendant cites *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), where the Court held, "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." It is defendant's position that requesting defendant to sign a consent-to-search form is the functional equivalent of further questioning. We do not agree.

*Rhode Island v. Innis, supra*, addressed the question whether police practices which were not literally questioning initiated by

law enforcement officers would endanger the *Miranda* protections nonetheless, because of the coercive atmosphere surrounding the interrogation environment. In *Rhode Island v. Innis*, the defendant was in a police car with three police officers and was being transported to the police station. The officers did not question the defendant, but in a conversation among themselves, in the hearing of defendant, commented on how necessary it was to find the shotgun being searched for, in order to avoid its falling into the hands of children in the area. There was no express questioning of defendant, but the *Innis* Court noted: "The concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." 446 U.S. at 299.

The *Innis* Court then developed the concept of the "functional equivalent of questioning" test and stated:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

446 U.S. at 301.

The *Innis* Court determined that the conversation among the police officers did not constitute questioning of the defendant in violation of *Miranda*.

In the *Innis* case, both the majority and dissenting opinions concentrate on the right of a defendant not to be required to make *statements* of any kind—thus recognizing a person's right under the Fifth Amendment to the U.S. Constitution not to be "compelled in any criminal case to be a witness against himself." That same right is protected by article I, § 12, of the Nebraska Constitution.

The situation present in this case has nothing to do with pursuing an interrogation seeking to have defendant make statements contrary to his interest. The right of defendant in the case before us is the right guaranteed to him by the Fourth Amendment to the U.S. Constitution, concerning "[t]he right

of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." That same right is the subject of article I, § 7, of the Nebraska Constitution.

A potential issue in the question before us is defendant's right to counsel as guaranteed to a defendant by the Sixth Amendment to the U.S. Constitution and by article I, § 11, of the Nebraska Constitution. That right generally does not become effective until some adversary court proceedings are begun against a defendant. Defendant makes no allegations of any violation of his Sixth Amendment rights. The record shows that defendant was released from custody after he had executed the consent to search, and while we do not know the date of the formal charges against defendant, the record shows that a preliminary hearing was not held until December 2, 1988, and an information was filed that same day.

We determine that requests made to a defendant by one seeking consent to search the defendant's residence do not constitute further questioning, or the functional equivalent of further questioning, after counsel has been requested by the defendant. As stated by the Supreme Court of Wisconsin in holding that it is improper to frame a consent-to-search issue in *Miranda* and Fifth Amendment terms, "Those authorities do not control because consent to search is not testimonial or communicative in nature, even if the consent leads to the discovery of incriminating evidence." *State v. Turner*, 136 Wis. 2d 333, 351, 401 N.W.2d 827, 836 (1987).

In *Cody v. Solem*, 755 F.2d 1323 (8th Cir. 1985), the U.S. Court of Appeals for the Eighth Circuit, on a petition for habeas corpus, reviewed the conviction of a defendant convicted in South Dakota of murder, *State v. Cody*, 293 N.W.2d 440 (S.D. 1980). Among the issues raised was defendant's contention that his right to counsel had been violated by the state's request for consent to search after defendant had requested counsel. The federal court held that the defendant's rights had not been violated, stating:

Nor can the *Miranda* violations under the fifth amendment support invalidation of the consent. As stated, the South Dakota Supreme Court suppressed the

incriminating statements Cody made during the course of the interrogations because the police did not cease questioning after Cody's request for counsel. *Cody* I, 293 N.W.2d at 443-49. Assuming the correctness of this holding, it does not follow that Cody's consent must similarly be suppressed. This is because "the fifth amendment right to counsel is not an independent right; rather, it stems from the privilege against self-incrimination." *Hall v. State*, 705 F.2d 283, 289 n. 4 (8th Cir.), *cert. denied*, ____ U.S. ____, 104 S.Ct. 339, 78 L.Ed.2d 307 (1983). Simply put, a consent to search is not an incriminating statement. *Id.*; *Smith v. Wainright* [sic], 581 F.2d 1149, 1152 (5th Cir.1978); *United States v. Lemon*, 550 F.2d 467, 472 (9th Cir.1977). Cody's consent, in and of itself, is not evidence which tends to incriminate him. While the search taken pursuant to that consent disclosed incriminating evidence, this evidence is real and physical, not testimonial. *United States v. Garcia*, 496 F.2d 670, 675 (5th Cir.1974), *cert. denied*, 420 U.S. 960, 95 S.Ct. 1347, 43 L.Ed.2d 768 (1975); *see also Schmerber v. California*, 384 U.S. 757, 761-64, 86 S.Ct. 1826, 1830-32, 16 L.Ed.2d 908 (1966). Any violation of Cody's fifth amendment rights with regard to the suppressed incriminating statements is thus only relevant to the voluntariness of the consent in view of the totality of the circumstances. *Smith*, 581 F.2d at 1152.

755 F.2d at 1330.

Similarly, in *United States v. Cherry*, 794 F.2d 201 (5th Cir. 1986), the court examined the validity of a consent to search given by the defendant after invoking his right to counsel. The consent resulted in discovery of evidence used in the defendant's conviction. The court specifically directed that the focus of the analysis with respect to the consent should be upon voluntariness. The court affirmed the defendant's conviction, concluding that the consent was not tainted by the fact that defendant had requested counsel before agreeing to the consent.

In *Tukes v. Dugger*, 911 F.2d 508, 513 (11th Cir. 1990), the court quoted with approval from *Smith v. Wainwright*, 581

F.2d 1149 (5th Cir. 1978), as follows: " '[T]he failure of the police to halt questioning once Smith [the defendant] mentioned his attorney, then is relevant only with regard to the Fourth Amendment issue of whether Smith's consent to search was voluntarily given.' "

We have indirectly determined that the fruits of a search are not testimonial evidence and that *Miranda* warnings need not be given before obtaining a consent to search. In *State v. Packett*, 207 Neb. 202, 204, 297 N.W.2d 762, 764 (1980), we stated, "The Miranda rules are not applicable to consent searches."

We hold that defendant's consent to search his residence was not invalidated by the fact that defendant had invoked his right to counsel during a police interrogation before his consent was given. In determining that *Miranda* is not applicable to consent searches, we are not saying that defendant has no rights in connection with consent searches. A defendant's consent must be voluntary. In this case, the trial court determined that defendant's consent was voluntary. Defendant does not contend to the contrary.

There is, of course, another reason why the fruits of the search were properly admitted. At the time of defendant's consent to the search, defendant was informed that an affidavit for a search warrant was being prepared. If defendant had not consented to the search, there is no doubt that the affidavit would have been completed and a search warrant obtained to perform the same search. The evidence would have been discovered inevitably. *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

Defendant's first assignment of error is without merit.

Defendant next contends that the trial court erred in allowing in-court identification of the defendant which was based on "photo identification of six individuals in which only one was similar to that of the Defendant."

Whether identification procedures were unduly suggestive and conducive to a substantial likelihood of irreparable mistaken identification is to be determined by a consideration of the totality of the circumstances surrounding the procedures. *State v. Gibbs*, 238 Neb. 268, 470 N.W.2d 558 (1991).

Defendant asserts that the identification process used to identify the defendant by State's witness Kelly Black was "so impermissibl[y] suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Brief for appellant at 25.

The facts show to the contrary. On the evening of September 28, Black positively identified defendant's picture from a group of six photographs. Defendant asserts that because this pretrial identification process was so suggestive, in addition to the unreliability of Black's basis for initial identification, any subsequent identification, including that at trial, based on this first identification must not be allowed into evidence.

In connection with the admissibility of identification evidence, we said in *State v. Richard*, 228 Neb. 872, 878, 424 N.W.2d 859, 864 (1988):

> "[In determining the admissibility of identification evidence, the trial court should consider] the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

The trial court gave proper weight to all those factors. Black testified that he saw the man's face under the lights of Black's "well lit" back porch. Black testified that he spent 45 minutes helping defendant get the car out of the ditch. In those 45 minutes, Black had the opportunity to view the defendant in the headlights of his pickup truck while defendant was hooking the tow chains to the mired car. He testified that he was "fairly close" to the man during this entire time.

Finally, although Black had seen "lots of photographs of [defendant] on TV" since the victim's disappearance and had seen defendant in jail clothes at the suppression hearing, Black testified that his in-court identification of defendant was not affected by any of these subsequent events. Black had more than ample time and occasion to observe the man on September 27 and made an admissible identification of defendant. The trial court did not err in admitting the identification evidence

about which defendant complains. Defendant's second assignment of error is without merit.

Defendant's third assignment of error contends specifically that the trial court erred in denying defendant's motion in limine because "evidence of DNA fingerprinting . . . has not been found sufficiently acceptable or reliable to the scientific community."

Defendant presents the position that the trial court erred in that the court violated the "*Frye* test." The *Frye* test stems from the decision in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), in which the court held in connection with the admitting of novel scientific evidence that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

In the case before us, since the trial court made no formal determinations as to the *Frye* test, the record does not disclose the basis used by the trial court in admitting the DNA evidence. Therefore, we do not know what the trial court used as the relevant scientific field for DNA admissibility. Some considerations as to that question may be found in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992); *People v. Mohit*, 579 N.Y.S.2d 990 (1992); *U.S. v. Yee*, 134 F.R.D. 161 (N.D. Ohio 1991); and William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va. L. Rev. 45 (1989).

The *Frye* test has been used in Nebraska, but until *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990), was not formally recognized. The *Frye* test, however, is not totally controlling as to the admissibility of novel expert testimony, but is only the first of several criteria that a trial court determines are satisfied before such testimony may be admitted. See, generally, *State v. Reynolds, supra*.

Defendant's brief goes beyond that specific issue to discuss other pertinent and important issues concerning DNA evidence. In view of the fact that forensic DNA evidence is relatively new and has not been discussed by appellate courts in

Nebraska, we set out herein general procedural and substantive rules with regard to DNA evidence in Nebraska.

A general summary of DNA theory and practice, as presented in this case, is necessary before the specifics of this case are discussed. The State called two witnesses on this issue: Lorah McNally, the laboratory supervisor in Lifecodes' forensic laboratory, and Kevin McElfresh, the director of the forensic laboratory at Lifecodes.

McNally performed the tests on the evidence in this case. As to her qualifications, she testified that she received a B.S. degree in biology from Cornell University and then received a master's degree in forensic science from John Jay College. She stated she had testified with respect to DNA testing about 30 times in 10 states and had been accepted as an expert witness on DNA in those cases.

As to DNA generally, McNally testified that DNA is the biological matter found within the center of nucleated cells. One DNA molecule is composed of a group of chromosomes. Humans have 46 of these chromosomes. The majority of DNA is similar from one person to the next. This explains the innumerable similarities among all humans. There are segments or "genes," however, along the DNA molecule which differ from one person to the next. Genes which have more than one variation are called alleles. Alleles are the segments of DNA which are used in identity testing.

McNally further testified that DNA was first described in 1953 by two researchers named James Watson and Francis Crick. They proposed the "double-helix" model often used today to represent the DNA molecule. The term refers to the fact that DNA consists of repeating chemical sequences between two strands (double) of material which are twisted (helix). The result of this combination is a ladderlike structure, with the "rungs" made up of complementary chemical bases which hold the two "sides" of the ladder together.

These chemical bases are adenine (A), thymine (T), guanine (G), and cytosine (C). The nature of these chemicals is such that A will bond only with T, and C will bond only with G. Therefore, if one side or strand of the ladder has an A on it, the other strand connecting to it must have a T in that same

location. The combination of these two bases is called a "base pair."

An individual's DNA pattern is inherited from his or her mother and father, each of whom contributes 23 chromosomes. However, even in a family with many children each will have a unique DNA code. This is true except for identical twins, who have identical DNA.

This is the basic theory of DNA as presented by the prosecution. Although McNally did not offer any opinion as to the general acceptance of this theory, McElfresh testified that the principle regarding diagnostic DNA testing has existed for a long period of time and is an accepted scientific principle. The State in its brief contends that this theory has been widely adopted by a vast majority of the jurisdictions which have addressed the issue. The State cites numerous cases, including *Vickers v. State*, 801 S.W.2d 214 (Tex. App. 1990); *U.S. v. Jakobetz*, 747 F. Supp. 250 (D. Vt. 1990); *State v. Pennington*, 327 N.C. 89, 393 S.E.2d 847 (1990); *Caldwell v. State*, 260 Ga. 278, 393 S.E.2d 436 (1990); *Spencer v. Com.*, 240 Va. 78, 393 S.E.2d 609 (1990); and others.

Defendant does not take issue with this part of the State's case. In fact, even the case to which defendant turns for support agrees that this theory is generally accepted. See *People v. Castro*, 144 Misc. 2d 956, 545 N.Y.S.2d 985 (1989). It would appear that the basic theory regarding DNA—that segments of DNA are different among individuals—is generally accepted among the relevant scientific communities. That finding, however, is one for the trial court to make, if the court determines the evidence before it supports such a finding. No such finding was made in this case, although it might be said that by holding that the DNA evidence was admissible, the trial court, by necessary implication, found that the theory was generally accepted.

Although the results of tests performed on DNA are sometimes called a DNA fingerprint, the term suggests an infallibility and certainty which the results do not have at this time. We, therefore, discuss the process and results as a DNA profile, and recognize that DNA results are expressed only as probabilities.

McNally testified that the DNA profile test is performed on various biological samples, including blood, semen, and dental pulp or any material with nucleated cells. In this case, the general process is called restriction fragment length polymorphism (RFLP) and consists of seven steps followed by the Lifecodes laboratory.

In the testing process, first the DNA material is isolated. Lifecodes isolates the evidence to be sampled and extracts the cells from it. The cells are broken open and the DNA within a cell's nucleus is released.

McNally testified that when released, the DNA molecule is in a long, complete strand. The strand, when stretched full length, is over 6 feet long and is still small enough to be contained within a cell, which itself is invisible to the unaided eye. Lori L. Swafford, Note, *Admissibility of DNA Genetic Profiling Evidence in Criminal Proceedings: The Case for Caution*, 18 Pepp. L. Rev. 123 (1990). In the second step, the DNA is cut up in order to make the strands smaller. This allows Lifecodes to identify segments which contain the unique codes. This process is accomplished by adding a cutting agent, called an enzyme, to the DNA. McNally likened the enzyme to a "scissors" which "reads down" the DNA molecule and cuts the strand at specific sites.

The third step is to separate the strands by size. The sample of DNA is placed in a gel, and then an electrical current is run through the gel. This process is called electrophoresis. Because DNA has a natural negative charge, the fragments in the electrical current will move away from the negative charge and toward the positive one. The larger, heavier fragments move more slowly and thus a shorter distance than the smaller, lighter fragments. After a fixed period of time of electrophoresis, the fragments are sorted by size, from the largest to the smallest.

The next step is to "denature" the sorted fragments. McNally explained:

> [W]hat denature means is when you look at this model and you have the T's and the A's, the bases are together, they're complementary and this is called double stranded because there is one strand that's complementary to the other strand and they're together. And what we want to do in

this next step of the process is to actually separate those strands. So what we do is we add something that will actually just unzip the molecule so that the T's — everything on the right side is going to split apart . . . basically what you are doing is you are just unhooking this base from this base, but these two being in the same strand are not going to become unattached. So that process, the reason we do that is when we add — what we're going to do is we have those fragments in the gel, we want to make those fragments separate from each other because what we're going to do later is visualize a difference based upon a certain region of DNA. And in order to visualize that, we need those fragments separate from each other. . . . So that after this denaturing process, the DNA fragments in that gel are now separate from each other.

In the fifth step, the fragments are transferred from the gel to a nylon membrane. The membrane receives the fragments in exactly the same position which they occupied in the gel.

In the sixth step, pieces of laboratory DNA, called probes, are washed over the membrane. The probes have a radioactive marker attached to them so that as a probe washes over the fragments and finds a complementary location, the probe bonds with the fragment and the marker allows it to be located by the testing scientists.

Actual visualization, however, is still impossible with the naked eye. In the seventh and last step, therefore, a sheet of x-ray film is placed over the membrane, and the radioactive markers then show up on the film as dark bands. This x-ray photograph is called an autoradiograph, or autorad. The autorad gives scientists a photographic representation of the migration of the fragments.

McNally testified that RFLP analysis has existed since the 1970's and has been commonly used for identifying genetic diseases. McNally has published articles in the Journal of Forensic Sciences regarding RFLP analysis, and she states that the process has been used in the United States and in other countries for genetic testing. McNally testified that RFLP analysis is generally accepted in the scientific community.

On cross-examination, McNally clarified that the original

RFLP analysis used in the 1970's was diagnostic and not forensic. She explained that diagnostic analysis uses fresh, whole, liquid blood, which is "a different type of sample" than used in forensic analysis. McNally testified that forensic analysis must use dried blood or semen stains or other material found in a criminal investigation. Such types of samples are exposed to natural elements of weather and decay. McNally testified, however, that forensic RFLP analysis has been used only since 1986.

With that truncated, overly simplified explanation of DNA, one can see the basis for our determination that the trial court erred in plunging into this extremely technical evidence for the first time in the jury's presence. It would have been an appropriate procedure to grant a hearing on defendant's motion in limine, and we later herein set out the matters which a trial court should determine preliminarily before submitting DNA evidence to a jury.

It might be said that if the trial court properly admitted the DNA evidence, the failure to grant a hearing outside the jury's presence as to the admissibility of the evidence would be harmless error. The fact is, however, that there may have been flaws in the evidence as presented, and the failure to conduct a proper hearing permitted improper evidence to go before the jury. This holding is the basis for the reversal of the judgment herein.

In summary, the trial court, in determining admissibility of DNA evidence, must first be satisfied, and find, as to the general acceptance of relevant DNA theories in the scientific community, and must be satisfied as to the acceptance and validity of the methodology of testing DNA used. The trial court then determines if specific procedures were properly followed in the case before the court. *U.S. v. Two Bulls*, 918 F.2d 56 (8th Cir. 1990); *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991). *Ex Parte Perry*, 586 So. 2d 242 (Ala. 1991); *Smith v. Deppish*, 248 Kan. 217, 807 P.2d 144 (1991). But cf. *Hopkins v. State*, 579 N.E.2d 1297 (Ind. 1991).

In the present case, the facts regarding Lifecodes' procedure are the following:

As stated above, two witnesses testified for the State

regarding the DNA profile test, McNally and McElfresh. McNally testified that Lifecodes has a number of quality controls to assure accuracy and reliability of the results. She stated that Lifecodes has a protocol. Protocol is defined as an explicit, detailed plan of an experiment. Dorland's Illustrated Medical Dictionary 1373 (27th ed. 1988). McNally testified that the Lifecodes protocol outlines the RFLP process in detail and is to be followed to ensure that all of the laboratory scientists perform the test in the same manner. The protocol is detailed in a manual and, McNally said,

> [t]he purpose of the protocol would be to outline each one of the steps from the point at which you receive the evidence to the isolation to the cutting up of the enzyme. It tells you how much [of] each component or reagent to add, how long to let the probes soak, and it really gives you a step-by-step description of the entire procedure.

The critical question regarding the procedure on the protocol used in this case is, Who prepared the manual containing the protocol which witness McNally testified she followed? The McNally DNA testing results can be admissible only if the protocol followed was established according to principles generally accepted in the relevant scientific fields. There is a complete void in the evidence before the court on this issue.

Lifecodes employs personnel to test all variable components of the RFLP test. This controls consistency and quality. In addition, Lifecodes has laboratory supervisors and directors whose responsibility is to be available to assist any laboratory scientists with questions on their work.

Defendant contends that until all laboratories form unified standards the tests will be unreliable. We do not agree with that contention. The fact that each laboratory has a written protocol for testing, made available to both parties and their experts, and that witnesses from these laboratories will subject themselves to cross-examination may be adequate proof of reliable standards and results. In this case, on cross-examination, defense counsel asked:

> Q. And was the protocol followed in this particular testing process?
> A. Yes it was.

Q. Well, we don't — you didn't bring a copy of the protocol with you here today?

A. It was not requested. You can call them and they can send you one if you would like.

The State rejoined, on redirect: "Q. Miss McNally, the protocol that Mr. Klein asked you about, did he ask that you bring a copy of that with you to court today? . . . A. No, he didn't."

Although defendant had access at some time to the Lifecodes protocol and defendant did not request that the State present that protocol at trial, proving that Lifecodes followed its own protocol when testing the samples in this case is part of the State's burden for foundation of the test results. The State did not establish what the protocol was or that this protocol was followed. McNally testified generally that the Lifecodes protocol was followed. The State did not produce evidence that the protocol was followed in this case.

Before either McNally or McElfresh offered their testimony regarding the results of the Lifecodes tests, defense counsel objected as to foundation. The objections were timely and should have been sustained. The State failed to establish that the opinion testimony of the experts was based on accurate information and test results. The DNA evidence should not have been admitted.

Defendant also contends that *United States v. Williams*, 583 F.2d 1194 (2d Cir. 1978), *cert. denied* 439 U.S. 1117, 99 S. Ct. 1025, 59 L. Ed. 2d 77 (1979), requires that the RFLP test be analogized to other scientific techniques the results of which are admissible. McNally testified as to the longstanding and widespread use of the DNA theory and RFLP testing in the diagnostic setting (as opposed to a forensic setting). This comparison and differentiation is important in considering Nebraska statutes that allow for the use of genetic testing in cases of paternity disputes. See Neb. Rev. Stat. § 43-1414 (Reissue 1988). The State correctly points out that Nebraska's Legislature has approved such uses of diagnostic genetic analysis. Without determining how such evidence should be admitted in those cases, we recognize the statute permitting this evidence. We distinguish this statutory endorsement from the present case, only insofar as we here deal with forensic samples.

Section 43-1414 is clearly aimed at diagnostic uses of DNA profiling. Defendant offered no opposition to McNally's comparison between forensic and diagnostic RFLP testing and in fact relied on it in cross-examination. Any questions which arise because of the fact that samples are forensic rather than diagnostic are addressed by cross-examination of the expert witnesses testifying for the proponents.

An entirely separate issue, apart from the testing techniques, must also be addressed. There is a question regarding the reliability of the probability calculations. When a match is declared, the essence of the conclusion is that the band patterns of one autorad match those of the other. The strength of the RFLP testimony is based in the statistical probability which experts attach to the likelihood of such a match's occurring coincidentally. All things being equal, the likelihood of a coincidental match decreases as the number of matching bands and the rarity of those bands increase.

The expression of a statistical probability is based on an assumption that when one RFLP test x ray is compared to another, the likelihood of coincidental matching of marker locations decreases as the number of markers used increases. The assumption in its base form is that all genetic traits occur independently of each other, and thus the presence of one trait does not cause, affect, or relate to the presence of another.

In 1908, two scientists, G.H. Hardy and W. Weinberg, theorized that in a population at equilibrium, the frequencies of all genetic traits remain constant from generation to generation. This is known as the Hardy-Weinberg equilibrium principle. McElfresh testified as an expert on this subject. McElfresh received a B.S. degree in biological sciences, a master's degree in molecular cellular developmental biology, and a doctorate in molecular and population genetics. McElfresh has published numerous articles and given a number of lectures and presentations on subjects relating to DNA print testing. McElfresh testified that to be valid, Hardy-Weinberg equilibrium requires that the population be large and that mating within the entire population must be random.

A necessary component of this principle is that as the number of alleles detected by any one probe increases, so should the size

of the population studied for that probe. This would verify Hardy-Weinberg equilibrium, at least with respect to those alleles. As an example, a study of 50 people which uncovers 50 different alleles for the same gene would indicate nothing about frequency of the alleles in the general population. However, a study of 500 people uncovering the same 50 alleles might suggest the frequency of occurrence of those alleles in the general population.

From a large enough sample group, a population geneticist could estimate the frequency of each allele in the population as a whole. This estimate is based on the validity of the Hardy-Weinberg equilibrium principle.

These estimates are also only as reliable as the data bases upon which they are based. McElfresh testified that Lifecodes' data base for the North American black population is "between 900 and 1,600" different alleles. For Caucasians the data base "is roughly 1,500 to 2,500." These estimates are quite broad, and a question to be determined is whether the data represent a sufficient number of people sampled from which geneticists can make accurate extrapolations. A trial judge should make appropriate findings in this area also.

McElfresh stated that based on observations made within the Lifecodes data base, it is possible to make predictions as to allele frequencies in the general population. These predictions by nature are generalizations made based on known facts.

The use of statistics by Lifecodes scientists is based on theories which are generally accepted, but a hearing before a trial judge should address the question whether a lack of adequate sampling may leave their probability conclusions too speculative. There may be insufficient testing of other racial and ethnic populations, which raises questions regarding to which population group a suspect would be compared if she or he were from a nontested group (e.g., Asian or Native American). The question of possible interbreeding among the groups should be addressed or explained. Here, we agree with defendant that the record before us does not contain evidence which resolves the question of the potential rate of error, if any, in these calculations.

Another possible problem associated with the DNA profile

test relates to the use of these statistics in testimony by the expert. When forensic analysis is reported, it is described in terms of probabilities. DNA profiling does not compare every base pair of the two fragments of DNA being compared. Probabilities are expressions of the likelihood of results if sufficient population could be sampled. All the estimate of probability does is narrow the field of prospective sources of DNA. Such testimony does not result in a specific identification.

The concern expressed by other jurisdictions and the defendant and shared by this court is that juries may receive probability testimony as infallible evidence. At oral argument, counsel for the State advanced the position that if this court determined that the DNA evidence was inadmissible, the admission of that evidence was harmless error, because the remainder of the evidence was overwhelming as to defendant's guilt. While we agree that the other evidence is sufficient to support defendant's conviction, we cannot say the DNA evidence was harmless. When the DNA evidence showed to a 99.9999995 percentage of probability that the blood in the trunk of Patterson's car was Patterson's blood, it is probable that the jury considered that factual matter no longer open to question. Reception of the DNA evidence cannot be said to be harmless error. *Ex Parte Perry*, 586 So. 2d 242 (Ala. 1991); *Commonwealth v. Curnin*, 409 Mass. 218, 565 N.E.2d 440 (1991); *State v. Pennell*, 584 A.2d 513 (Del. Super. 1989); *People v. Mohit*, 579 N.Y.S.2d 990 (1992).

We conclude that although it appears that the results of the DNA profile test are generally accepted in the relevant scientific communities and that such tests are reliable if performed in conformity with appropriate laboratory protocols, the probative value of population genetics probability testimony, at this time, must also be considered. Among the preliminary considerations which must be resolved by the trial judge is to determine if the potentially prejudicial effect upon the jury exceeds the probative value of the evidence. See Neb. Rev. Stat. § 27-403 (Reissue 1989).

We therefore reverse the conviction of defendant and remand the cause for further proceedings. In those proceedings in

connection with DNA evidence, the trial court is to preliminarily decide, outside the presence of the jury, on the basis of evidence before it: (1) whether the witnesses on the DNA issue are experts in the relevant scientific fields, (2) whether DNA profile testing used in the case under consideration is generally accepted by the relevant scientific communities, (3) whether the method of testing used in the case under consideration is generally accepted as reliable if performed properly, (4) whether the test conducted properly followed the method, (5) whether RFLP analysis evidence is more probative than prejudicial under § 27-403, and (6) whether statistical probability evidence interpreting RFLP analysis results is more probative than prejudicial. See, *People v. Castro*, 144 Misc. 2d 956, 545 N.Y.S.2d 985 (1989); *U.S. v. Two Bulls*, 918 F.2d 56 (8th Cir. 1990). Upon determination by the court that each of these conditions is satisfied, the evidence would be submitted to the jury, under appropriate instructions, for ultimate determination.

We recognize that with the passage of time, particularly in this fast-exploding field, some of the requirements set out above may become unnecessary. In the state of the art at this time, however, it does not seem appropriate to us to surrender important factual determinations solely to expert witnesses.

REVERSED AND REMANDED.

GRANT, J., participating on briefs.