Carlos A. DeJESUS, Appellant,

v.

STATE of Alaska, Appellee.

No. A–3201.

Court of Appeals of Alaska.

June 23, 1995.

James M. Hackett, Fairbanks, for appellant.

Cynthia L. Herren, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

*OPINION*

BRYNER, Chief Judge.

Carlos A. DeJesus pled no contest in 1988 to charges of first-degree escape and attempted first-degree murder. Prior to sentencing, DeJesus moved to withdraw his no

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

contest pleas. Superior Court Judge Niesje J. Steinkruger denied the motion. Judge Steinkruger sentenced DeJesus to a composite term of eighty years with twelve years suspended. Judge Steinkruger subsequently dismissed an application for post-conviction relief in which DeJesus claimed that his original attorney had provided him ineffective assistance in connection with the entry of his no contest pleas and his later motion to withdraw that plea. DeJesus appeals, claiming that the superior court erred in issuing these rulings. DeJesus also asserts that his sentence is excessive. We remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

To lend focus to the issues we are called upon to consider, we must describe in some detail the factual and procedural events that culminated in this appeal. On September 1, 1988, Fairbanks Police Officer Peggy Sullivan attempted to arrest DeJesus for carrying a concealed weapon (a knife). DeJesus resisted and began struggling with the officer. In the course of the struggle, DeJesus' female companion, Carese Sumpter, handed DeJesus a handgun. DeJesus allegedly pointed the gun at Sullivan's head, demanded the officer's gun, and threatened to kill her. Sullivan pulled her gun from its holster; a shootout ensued. DeJesus allegedly fired first, shooting seven rounds, one of which struck Sullivan in the arm. Sullivan fired four rounds in return; the four shots struck DeJesus in the abdomen, pelvis and thigh. DeJesus fled the scene with Sumpter as Sullivan ran for cover. Other officers soon arrested DeJesus near the shooting scene.

As a result of the shooting incident, the state charged DeJesus with attempted first-degree murder, first-degree escape, second-degree assault, and fourth-degree misconduct involving a controlled substance.[1] On December 5, 1988, DeJesus appeared before Judge Steinkruger and entered pleas of no contest to the attempted murder and escape charges. Pursuant to the terms of a plea

bargain, the state agreed to dismiss DeJesus' remaining charges. Judge Steinkruger scheduled sentencing for March of 1989.

On January 13, 1989, about five weeks after his change of plea hearing, DeJesus, through counsel, moved to withdraw his no contest pleas, asserting that "the testimony of a witness will show that he [DeJesus] did not intend to kill the police officer and thus should not have pled no contest to Attempted Murder in the First Degree." Judge Steinkruger conducted a hearing on DeJesus' motion on March 20, 1989. At the hearing, DeJesus' counsel called Richard Hudson as a witness. Hudson, an acquaintance of DeJesus, testified that he had witnessed the shooting incident, that Sullivan had fired first at DeJesus, that DeJesus had not pointed his gun at Sullivan before Sullivan shot him, and that DeJesus had fired his gun only after being shot.

Hudson also testified that he had not been able to tell DeJesus about his observations until two or three weeks after Hudson had himself been arrested and incarcerated (for unrelated matters) at the Fairbanks Correctional Center on December 6, 1988—the day after DeJesus' change of plea hearing. According to Hudson, two or three weeks after his own arrest, he encountered DeJesus in the correctional center's gymnasium; Hudson described what he had seen at the time of the shooting and asked DeJesus why he had pled guilty to attempted murder when it was the officer who had shot first. Hudson testified that DeJesus responded that he had no memory of the shooting because he had been drinking most of the preceding day and "was on blackout."

Although Hudson testified that he had no opportunity to speak personally with DeJesus about the shooting until their December jailhouse encounter, Hudson insisted that, some time before his December 6 arrest, he had telephoned DeJesus' attorney and had told the attorney what he had observed at the shooting scene. Hudson testified that he believed that DeJesus' attorney had recorded this telephone conversation.

---

1. DeJesus evidently had a small quantity of cocaine on his person when he was taken into custody after the shooting.

After presenting Hudson's testimony, DeJesus' counsel argued that the eyewitness evidence amounted to a fair and just reason for allowing withdrawal of DeJesus' no contest pleas. Defense counsel emphasized that DeJesus had acted promptly in response to the new information; counsel disclosed that, after DeJesus' jailhouse conversation with Hudson, DeJesus had contacted his attorney without delay and, based on Hudson's statements, had asked that a motion be filed to allow him to reinstate his not guilty pleas. DeJesus' counsel arranged for an investigator to interview Hudson on January 9, 1989, and four days later filed DeJesus' motion to withdraw the no contest pleas.

In response to defense counsel's characterization of Hudson's testimony as newly discovered evidence, Judge Steinkruger asked counsel about Hudson's testimony indicating that Hudson had discussed his version of events with counsel by telephone some time before Hudson's December 6, 1988, arrest. The court reasoned that if this discussion had in fact occurred, counsel would have had the information prior to DeJesus' change of plea hearing, which was held on December 5, only one day before Hudson's arrest. At the change of plea hearing, DeJesus had assured the court that he had had the opportunity to discuss the evidence with his attorney. Noting DeJesus' earlier assurances, Judge Steinkruger asked defense counsel to "[e]xplain to me the discrepancy."

DeJesus' counsel explained that he had spoken to Hudson earlier that morning, just before the hearing, and had asked if Hudson had previously discussed the matter with anyone else. According to defense counsel, Hudson

> told me that he had discussed it with me. I was a bit taken aback, because I didn't recall having discussed these facts with Mr. Hudson or with anyone else prior to January 9 of this year, when my investigator went out to interview him. In talking further with Mr. Hudson, and certainly listening to him here on the stand, I do recall that he did, in fact, call my office. I don't recall what date that was. And we did talk about his knowledge of what he

had seen on the early morning of September 1st[.]

DeJesus' counsel went on to explain, however, that he did not recall ever telling DeJesus about Hudson's original communication: "I'll just leave it at that.... I can safely say that if I didn't recall it this morning, I don't recall ever having discussed that specifically with Mr. DeJesus until after a copy of the interview with Mr. Hudson was provided to him on or about January 10, 11, and 12 [of] this year."

After listening to this explanation, the prosecutor informed Judge Steinkruger that the state now thought it necessary to call defense counsel as a witness to determine the precise nature and timing of counsel's earlier communications with Hudson. The prosecutor indicated that defense counsel's apparent failure to mention Hudson's original statement to DeJesus "[l]eads the state to believe that Mr. Hudson did not say anything like what he said today[.]" The prosecution thus asked to call defense counsel as a witness to "clear this matter up[.]" In making this request, the prosecutor pointed out that, "if that's going to happen, then, of course, probably Mr. DeJesus needs another lawyer."

Judge Steinkruger found that DeJesus' attorney had indeed become a witness and that a conflict of interest had therefore arisen between DeJesus and his attorney. On this basis, the judge scheduled further proceedings for another date and ordered new counsel appointed for DeJesus.

Shortly after adjourning the hearing, however, Judge Steinkruger summoned the parties back to the courtroom. Upon reconvening, DeJesus' attorney revealed that he had just talked to an associate, who recalled that Hudson's original conversation with DeJesus' attorney may have been recorded. Judge Steinkruger then continued the hearing until the afternoon, directing DeJesus' attorney to search for the tape and produce it at the afternoon hearing. That afternoon, DeJesus' attorney evidently produced and played for the court the tape recording of his conversation with Hudson. The recording had been made on November 25, 1988—ten days before DeJesus entered no contest pleas. Hudson's taped description of the shooting inci-

dent apparently coincided with the description he gave during his testimony at the March 20, 1989, hearing.[2]

Upon hearing the tape-recorded conversation, Judge Steinkruger asked DeJesus' attorney if listening to the tape had refreshed his memory about whether he had discussed Hudson's November 25 statement with DeJesus before the December 5 change of plea hearing. Counsel said that he still had no independent recollection of discussing the topic with DeJesus. Judge Steinkruger then continued the hearing to March 24, 1989, requesting defense counsel to review jailhouse visiting records and his own files for any information that might refresh counsel's recollection or shed light on whether Hudson's statement was disclosed to DeJesus prior to the change of plea hearing.

At the March 24 hearing, DeJesus' counsel informed the court that his review of available files and records established that he had visited DeJesus on three occasions between November 25 and December 5, 1988. But counsel had found nothing to refresh his memory as to whether he had mentioned Hudson's statement during any of these visits: "I cannot say definitively that I did or did not discuss the matter with Mr. DeJesus."

The prosecution thereupon asked to call DeJesus as a witness on the issue. DeJesus' counsel voiced no objection. On direct examination by the prosecution DeJesus initially insisted that when he changed his plea his attorney had not talked to him about what Hudson might testify to: "I wasn't know about nothing at all. There was another witness.... I wasn't know about that."[3] However, DeJesus went on to reveal that, shortly before the December 5 change of plea hearing, he had asked his attorney to talk to Hudson but had received a negative response. According to DeJesus:

> I'm the—I'm the one who told him [DeJesus' counsel] about it, because I called—I called one time, my old lady, to see how my kid was, and she say she received a phone call from Rick, and she talked to him. You know, in the street. And he—he told her that that night I got shot that he was with Michelle [Hudson's girlfriend], and they saw us—they saw us, and they saw when the cop shoot at me. And they thought I was—I was dead.

According to DeJesus, when he told this information to his attorney, his attorney replied "that that was no important point. It was going to do no good to me in here.... He said that was good for my sentencing." DeJesus further claimed that his attorney said "[h]e was making, already, a deal with you [the prosecutor]. And then, also, he say to me that the—that was only five to twenty. Five to twenty years. He make a deal with you I be probably be—my sentence can be up to thirteen years, and I can be out of prison by parole seven or eight years."

The prosecutor asked DeJesus no further questions. Judge Steinkruger then sought to clarify whether DeJesus had "already talked to [his attorney] about Mr. Hudson" when he changed his plea; DeJesus reiterated that "[w]e told him about it, and he say to me that ... it was going to do nothing good[.]" The court inquired, more specifically, whether

---

**2.** No transcript of the afternoon hearing of March 20, 1989, has been included in the record; nor does it appear that the tape recording of the conversation between Hudson and DeJesus' trial counsel was actually incorporated into the trial court's file or retained by the court. The circumstances surrounding the afternoon hearing, which are not actively disputed by the parties, were eventually described by DeJesus' trial counsel in his March 28, 1989, Memorandum in Support of Motion to Withdraw as Counsel and by Judge Steinkruger in her July 10, 1989, written order denying DeJesus' motion to withdraw his no contest pleas. Although Judge Steinkruger's written order describes the tape recording as having been produced and played at a hearing on March 24, 1989, the March 28 memorandum filed by DeJesus' trial counsel and the transcript of the March 24 hearing itself make it clear that the tape recording was produced and played to the court, as originally directed, at a hearing on the afternoon of March 20, 1989.

**3.** DeJesus' first language is Spanish, and he speaks English with a heavy accent. At his change of plea hearing, however, DeJesus' counsel assured the court that DeJesus was sufficiently versed in English to proceed without an interpreter. In rejecting DeJesus' subsequent motion to withdraw his no contest pleas, Judge Steinkruger found that, despite his heavy accent, DeJesus was capable of understanding the proceedings.

DeJesus had "discussed any evidence that Rick Hudson might have[.]" DeJesus emphatically declared that he had "never talked to ... Rick Hudson." When pressed again by the court as to whether he had talked with his attorney about Rick Hudson, however, the following exchange occurred:

A   I tell—I told him that my old lady told me that Rick Hudson—he saw everything.

Q   Right.

A   I have no (indiscernible) the car for the shooting. I ...

Q   And you had told [your attorney] that before you came to court.

A   I explained—I told [my attorney] about it. It means I get the phone, I tell it I was going to try to get a phone with my old lady to see he can get ahold of Rick Hudson. You know. Then he come back to see me, and he say, 'ey—yeah, he gives me the whole—all the *invo* (ph) that was (indiscernible) cases because when I say to him was it in court, and they already got a deal.

Q   Okay.

A   You know.

Q   And that was before you came ...

A   Yeah.

Q   ... to court on the deal.

A   Yeah. They—when I found out, you know, that it's real important, too, you know, because the jury care to know, about it, too, you know, that's when I went to the law library over there and started reading a book on what the people over there say (indiscernible) super hard to put a—that's supposed to be hard to use, and the ...

Q   Uh-huh.

A   Because that's the part *you play.* [Transcriber's emphasis]

The core dispute presented in this appeal was engendered by this exchange. DeJesus' trial counsel interpreted his client's statements to Judge Steinkruger as an acknowledgment by DeJesus that DeJesus had discussed the substance of Hudson's November 25 statement with counsel prior to the December 5 change of plea hearing. Counsel

thought that DeJesus had in effect admitted having prior knowledge of the information that counsel had recently presented to the court as newly discovered—Hudson's exculpatory version of events. Counsel thus concluded that he had been manipulated by his client to file a plea-withdrawal motion based on a false claim of newly discovered evidence.

When Judge Steinkruger finished her examination of DeJesus, DeJesus' counsel declined to ask any questions of his client, and DeJesus was excused as a witness. Judge Steinkruger called upon defense counsel for further argument on the withdrawal motion, but counsel declined to make further argument, stating: "I find myself in an awkward position, given the statement that I've given to the court, and documentation that I have. And the statements of Mr. DeJesus." Judge Steinkruger, indicating that she could simply take the plea-withdrawal motion under advisement and decide it without further argument, suggested that she would have "no problem ... if you'd just like to stand on your briefing, at this stage." DeJesus' counsel replied, "That'll be fine." The judge scheduled a hearing for March 29 to announce her decision on the withdrawal motion. DeJesus' counsel informed the court that he would file a motion to withdraw as counsel prior to that date.

On March 29, Judge Steinkruger announced her decision denying DeJesus' motion to withdraw his no contest pleas. DeJesus' counsel, in the interim, had formally moved to withdraw from the case. In his motion, counsel alleged that he could "no longer zealously represent the interests of this defendant." Counsel asserted, among other things, that his client had led him down "the primrose path" by making him believe that counsel had "relevant information ... that had not been shared with the defendant." Counsel further asserted that, during the March 24 hearing, "defendant testified, contrary to counsel's belief and expectations based on the previous hearings, that when he changed his plea on December 5, 1988, [c]ounsel had *already* discussed Hudson's statement." (Emphasis in original.) Given this testimony, counsel claimed that "[t]his is a case where the integrity of counsel was

either recklessly or intentionally placed at issue in what appeared to be an attempt to fraudulently induce the court to consider a course of action, and to take a requested course of action. Counsel is grossly offended and cannot ethically and in good conscience continue to represent this defendant."

The position advocated by defense counsel in his motion to be relieved from the case is essentially the same position the superior court relied on in denying DeJesus' motion to withdraw his no contest pleas. In her March 29 decision on the plea-withdrawal motion, Judge Steinkruger found: "It's clear from Mr. DeJesus' testimony under oath that he was aware of Mr. Hud—the evidence which Mr. Hudson had to offer and that he had discussed it with counsel prior to his change of plea. It's clear that this is one of the factors taken into account in relationship to the change of plea." On this basis, Judge Steinkruger found that "the motion to withdraw the plea is an attempt to manipulate the system by the defendant and delay the proceedings. In fact, it appears that the defendant has manipulated defense counsel to file a motion when it was clear by the defendant's own testimony that he was aware of the evidence which Mr. Hudson may have had[.]"

Judge Steinkruger went on to find that DeJesus had simply "changed his mind. He apparently has re-evaluated the evidence which is the same evidence he had prior to his entry of plea[.]" The judge concluded that this did not amount to a fair and just reason to allow DeJesus to withdraw his no contest pleas. Accordingly, even though Judge Steinkruger found that there had been no significant delay in filing the motion to withdraw and that "there's very little prejudice to the state if the plea is withdrawn[,]" the judge denied DeJesus' motion.

Upon denying DeJesus' motion, Judge Steinkruger allowed DeJesus' original attorney to withdraw from the case and ordered the appointment of a new attorney to handle DeJesus' case. Sentencing was eventually set for July 26.

On May 19, 1989, prior to the sentencing hearing and evidently before a new attorney had actually entered an appearance on DeJesus' behalf, DeJesus filed a *pro se* application for post-conviction relief alleging that his original attorney had been incompetent in handling DeJesus' change-of-plea hearing and the subsequent motion to withdraw his no contest pleas. With regard to the change-of-plea hearing, DeJesus alleged that his original attorney had failed to explain the sentence that DeJesus might receive and had misled DeJesus to believe that he could not receive "a very large sentence." With regard to the plea-withdrawal motion, DeJesus complained that his attorney's allegation that DeJesus had attempted to perpetrate a fraud on the court "had the effect of counter acting any motion he filed for me to reverse the plea. This affidavit of [trial counsel] makes accusations which were unsubstantiated and had the effect of prejudicing the court's decision making processes[.]"

DeJesus' post-conviction relief application did not receive attention immediately, and his case proceeded to sentencing, where DeJesus was represented by a new attorney. After hearing extensive testimony concerning the circumstances surrounding the shooting incident, Judge Steinkruger found the attempted murder and escape offenses to be extremely aggravated and DeJesus' prospects for rehabilitation to be poor. The judge sentenced DeJesus to a term of sixty-five years with ten years suspended for attempted murder and to a consecutive term of fifteen years with two years suspended for escape. DeJesus appealed.[4]

4. Even though the attorney who replaced DeJesus' original counsel represented DeJesus at the sentencing hearing and in the subsequent handling of DeJesus' post-conviction relief application, a new attorney was appointed to handle DeJesus' case on appeal. Appellate counsel filed a notice of appeal contending that the superior court erred in denying the plea-withdrawal motion, that DeJesus had received ineffective assistance of counsel, and that his sentence was excessive. For reasons not germane here, appellate counsel later failed to perfect the appeal and took no steps to pursue an appeal of the superior court's later order dismissing DeJesus' application for post-conviction relief. The appeal was dismissed and eventually reinstated upon proof to this court of good cause for reinstatement.

Not long after the sentencing hearing, De-Jesus filed, through his new counsel, an amended application for post-conviction relief, which amplified the allegation of ineffective assistance of counsel contained in the earlier *pro se* application by adding a new claim: that DeJesus' original counsel had been ineffective in failing to investigate and assert a defense to attempted murder based on diminished capacity. Thus, DeJesus' amended application advanced three distinct theories of ineffective assistance: incomplete and misleading advice as to the potential sentence; conflict of interest in the presentation of the plea-withdrawal motion; and failure to pursue a defense based on diminished capacity.

The state moved to dismiss the amended application, arguing that DeJesus had failed to make a *prima facie* showing of ineffective assistance of counsel. In particular, the state pointed out that DeJesus had failed to overcome the presumption of competence by neglecting to submit an affidavit from his original counsel. DeJesus then arranged a deposition of his original attorney; the deposition was held on October 11, 1989. DeJesus did not inquire about the circumstances surrounding his counsel's handling of the plea-withdrawal motion. His original counsel's deposition testimony addressed only the other two facets of DeJesus' ineffective assistance of counsel claim.

On the issue of diminished capacity, counsel stated that he had considered the defense and decided that there was not enough evidence to justify raising it. In contrast, with respect to his pre-plea sentencing advice to DeJesus, counsel acknowledged that, although he had made no guarantees, he had told DeJesus that DeJesus could expect to receive a total sentence of between ten and thirteen years' incarceration. Counsel also candidly admitted that, at the outset of the sentencing hearing, he had been under the impression that attempted murder was a class A felony (punishable by a maximum of twenty years) rather than an unclassified felony (punishable by a minimum of five years and a maximum of ninety-nine):

Q Okay. And did you discuss with Mr. DeJesus prior to the time that he changed his plea this range of sentences that was possible for each of the offenses listed?

A With the possible exception of the range of sentences for attempted murder. I recall at one hearing in court where it was my understanding, and what I'd communicated to Mr. DeJesus was that the range was five to I believe twenty at that time. And I think you, [the prosecutor], and perhaps the court as well at that time informed me that there had been a recent change and that it was now five to ninety-nine years. I believe, also, at that time, you know, we took a minute or so of whatever time in court and went over that with Mr. DeJesus and then the court continued with whatever the proceeding was.

On further cross-examination by the prosecution, counsel conceded the possibility that he had been informed, prior to the change of plea hearing, that the maximum sentence for attempted murder was ninety-nine years, and not twenty years. But counsel insisted that he had no memory of discussing the maximum sentence with the prosecutor. Counsel suggested, "I think what would clear that up would be listening to whatever hearing that was because I distinctly recall that I was surprised or did not know that the range had been up to ninety-nine years."[5]

On January 8, 1990, after reviewing all pertinent pleadings, including the deposition transcript, Judge Steinkruger summarily dismissed DeJesus' amended application. DeJesus' appeal of this dismissal order has now been consolidated with his direct appeal.

### PLEA WITHDRAWAL

DeJesus argues that the superior court erred in denying his motion to withdraw his no contest pleas. He claims that he met his

---

**5.** Notably, this suggestion echoed a statement in DeJesus' original, *pro se* application for post-conviction relief: DeJesus asserted, in support of his contention that trial counsel had misled him as to the likely sentence, that "[t]his can be proven by a study of the tape of my court appearance where I plead no contest on 3/20/89."

burden of establishing a fair and just reason for withdrawal. Alternatively, DeJesus maintains that the court erred in ruling on the plea-withdrawal motion after it became clear that a conflict of interest had developed between himself and his attorney in connection with DeJesus' pre-plea awareness of the information addressed in Hudson's March 20, 1989, testimony. We need address only the latter issue, for we find it dispositive.

■■■ We have previously held that when an attorney's "ethical and moral dilemma [is] squarely at odds with his duty" to protect his client, the attorney should withdraw as counsel. *Smith v. State,* 717 P.2d 402, 406 (Alaska App.1986). Here, trial counsel's situation arguably became at least marginally conflicted at the conclusion of the initial hearing on DeJesus' plea-withdrawal motion, when the prosecution sought to call counsel as a witness to determine the nature and timing of counsel's prior communications with Hudson.[6] Indeed, Judge Steinkruger recognized the problem and ordered a new attorney appointed for DeJesus.

The judge held this order in abeyance, however, because, shortly after the initial March 20 hearing adjourned, the parties returned to court, and DeJesus' counsel announced that his initial conversation with Hudson may have been recorded. The court ordered counsel to locate the tape, which was found, produced, and played in open court at a third hearing later the same day. Because the tape did not refresh counsel's recollection as to whether and what he had communicated with his client, the court rescheduled proceedings for March 24 and ordered counsel to conduct a search for further information to shed light on the issue.

Although counsel was never actually called as a witness, the potentially conflicting demands facing him in this situation certainly did not abate during these events, for counsel was in effect assigned by the court to engage in a hunt for records and information that might enhance his ability to testify, or serve in lieu of testimony; and it seems apparent— at least in retrospect—that production of this information might have been contrary to the interests of counsel's client. If the state's announced intention of calling counsel as a witness justified the court's immediate order requiring a new attorney to be appointed to represent DeJesus, then it seems questionable whether the ensuing events of the day justified the court's decision to hold the order in abeyance.

For present purposes, however, we need not decide whether these circumstances gave rise to a conflict requiring counsel's immediate withdrawal; we assume that they did not. In light of these circumstances, however, it seems clear that the situation with respect to conflict was already marginal when the court convened the March 24, 1989, hearing. At that time, counsel promptly reported that he had met three times with DeJesus between November 25 (the date of Hudson's taped statement) and December 5, the date of the change of plea, but still had no recollection of discussing Hudson's statement with DeJesus. The state called DeJesus as a witness to clarify the situation. We continue to assume that the situation remained conflict-free at this point. By the conclusion of DeJesus' testimony, however, any latent ambiguity had clearly dissipated: a clear conflict of interest had arisen.

By the time DeJesus had finished testifying, DeJesus' counsel plainly and unambigu-

---

**6.** The applicable disciplinary rule that was in effect at that time read:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

*Code of Professional Responsibility* Rule 5–102(B) (West 1988).

The Alaska Supreme Court has noted that the "roles of advocate and witness are fundamentally incompatible." *Estate of McCoy v. Stonefield,* 844 P.2d 1131, 1136 n. 7 (Alaska 1993) (citing *J.D. Pflaumer, Inc. et al. v. United States Dep't of Justice,* 465 F.Supp. 746, 748 (E.D.Pa.1979)); accord *Munn v. Bristol Bay Hous. Auth.,* 777 P.2d 188, 196–97 (Alaska 1989). Other jurisdictions are in agreement with this proposition. *See, e.g., Commonwealth v. Shraiar,* 397 Mass. 16, 489 N.E.2d 689, 693 (1986) (attorney's loyalty to his client prevents him from "simultaneously serving as both defense counsel and prosecution witness, where the attorney's testimony will prejudice the defendant").

ously viewed his situation as conflicting with that of his client, who, in counsel's view, had just led him down "the primrose path." [7] Although counsel made known to the court that he viewed the situation as "awkward," he did not immediately seek to withdraw, but merely announced his future intention to do so. Despite the obvious conflict, and while still acting nominally as DeJesus' attorney, counsel made known to the court his own distinctly unfavorable interpretation of DeJesus' testimony, declined to question DeJesus, and agreed, at the court's suggestion, to submit the withdrawal motion for decision with neither further evidence nor argument. And despite the obvious conflict, the court accepted counsel's decision to submit the matter. While allowing counsel to continue serving nominally as DeJesus' attorney, the court proceeded to decide the motion against DeJesus, adopting defense counsel's view that DeJesus had manipulated both the court and his own attorney.

We think it self-evident that DeJesus had the right to be zealously represented by counsel throughout the course of these proceedings. Conversely, DeJesus' counsel should have ceased all representation and withdrawn as soon as it became clear that DeJesus' interests were in conflict with counsel's own. Counsel did not do this. Rather, by waiving the right to cross-examine DeJesus and agreeing to submit the plea-withdrawal motion for decision without further evidence or argument, counsel affirmatively relinquished procedural rights that belonged to his client—rights that might have been crucially significant to DeJesus at the precise point of their surrender. By waiving cross-examination of DeJesus and submitting his motion for decision without further proceedings, counsel in effect surrendered on the merits of the motion itself with no effort whatsoever to clarify or rehabilitate DeJesus' testimony.

The point is hardly academic. For while defense counsel and the court were both satisfied to proceed on the basis of their initial interpretation of DeJesus' testimony,

DeJesus plainly was not. And a careful examination of the transcript of DeJesus' testimony leaves ample room to question whether the interpretation adopted by counsel and the court is in fact accurate. While it is possible to read DeJesus' testimony as acknowledging that he had discussed Hudson's potential testimony with his attorney before changing his plea, DeJesus' heavily accented and rather inarticulate answers leave the precise meaning of his testimony in doubt. At no point does DeJesus appear to expressly acknowledge being aware of or discussing with his attorney prior to his change of plea hearing the substance of the information addressed by Hudson in his tape-recorded interview of November 25, 1988, and his testimony of March 20, 1989.

In fact, when read in its entirety, DeJesus' testimony arguably lends itself to an interpretation that would be entirely consistent with the conclusion he had no knowledge of the substance of Hudson's proposed testimony when he changed his pleas: DeJesus can be read as saying that he had been informed by his girlfriend that Hudson had witnessed the shooting; that he relayed this information to counsel and attempted to convince counsel to follow up; but that he was told that a deal was already in the works and that Hudson's testimony could be of no use except for sentencing purposes. The transcript does not rule out this interpretation, nor does it unequivocally establish that, before changing his plea, DeJesus was aware of and discussed with counsel the substance of Hudson's proposed testimony.

We do not profess to know what DeJesus actually meant by his testimony, and we express no view as to his likely meaning. We observe only that, at a minimum, the issue remains clouded in sufficient ambiguity to deserve clarification. DeJesus was entitled to have the uncertainty clarified in the adversarial context of the March 24 hearing. Yet the events of the day left him without an advocate capable of zealously representing his interest in ensuring that an effort at clarification was made. Instead, his case was

---

**7.** In his later written motion to withdraw, counsel would openly declare that, in light of DeJesus' testimony, he was incapable of zealous represen-

tation—that he could not "in good conscience continue to represent this defendant."

surrendered without further struggle by an attorney whose interests, at that time, were plainly at odds with those of his client.

Under the circumstances, we conclude that the superior court erred in ruling on the merits of DeJesus' motion without first appointing replacement counsel and allowing counsel the opportunity for further argument and inquiry. Given the error, we find it necessary to vacate the order denying the plea-withdrawal motion and to remand the case for further proceedings.[8]

## POST–CONVICTION RELIEF

DeJesus separately appeals the superior court's order dismissing his application for post-conviction relief. Alaska Criminal Rule 35.1 governs post-conviction relief applications. This rule establishes "a three-phase process, the first phase involving the filing of the application and the assessment of its sufficiency to set out a *prima facie* case for relief, the second phase involving discovery and review for genuine issues of disputed fact, and the third involving the evidentiary hearing and formal resolution of disputed facts." *Parker v. State*, 779 P.2d 1245, 1246 (Alaska App.1989) (footnote omitted). Here, the superior court disposed of DeJesus' application in the first phase of the process, ordering the application dismissed for failure to set out a *prima facie* case for relief. In reviewing the superior court's decision, we must thus determine whether the application sets out facts which, if true, would entitle DeJesus to the relief claimed. *See* Alaska R.Crim.P. 35.1(f)(2); *State v. Jones*, 759 P.2d 558, 565 (Alaska App.1988).

As we have already indicated, the claim of ineffective assistance of counsel advanced in DeJesus' application rests on three distinct theories. One of these theories—that DeJesus' original attorney was ineffective in his handling of the plea-withdrawal by virtue of a conflict of interest—is moot in light of our decision vacating the superior court's order denying the plea-withdrawal motion; the remaining two theories are not moot.[9] One of the two remaining theories—that DeJesus' original counsel was ineffective in failing to explore the possibility of a diminished capacity defense—requires little discussion. In his deposition, DeJesus' original counsel expressly testified that he had considered and rejected a diminished capacity defense. DeJesus has alleged no facts indicating that his counsel's decision was unsound or incompetent. With respect to this theory, he has therefore failed to overcome the presumption that his attorney acted competently. *See Parker*, 779 P.2d at 1247; *Jones*, 759 P.2d at 569. The superior court did not err in dismissing the application as to this theory.

The court's rejection of DeJesus' last theory—that his attorney provided him with incorrect sentencing information—is more problematic. The deposition of DeJesus' counsel provides strong support for the conclusion that at the outset of the case, counsel mistakenly believed attempted first-degree murder to be a class A felony, subject to a maximum term of twenty years. The deposition, when read in the light most favorable to DeJesus, further supports DeJesus' claim that counsel remained under this misimpression when he advised DeJesus to change his pleas to no contest. Finally, the deposition

---

**8.** Despite the passage of time and the obvious possibility of changed circumstances, on remand DeJesus' plea-withdrawal motion must be restored to and considered in its original procedural context—that is, the superior court must decide the case as a presentence plea-withdrawal motion; the issue of potential prejudice to the state, if reached, must be governed by the court's prior factual findings.

**9.** Since the conflict-of-interest theory pertains only to the propriety of DeJesus' attorney's actions after entry of the no contest pleas, if DeJesus prevailed on this theory of ineffective assistance, he would not thereby be entitled to with-

draw his plea, but only to relitigate the plea-withdrawal motion. This is the relief he has been granted by our decision vacating the order denying that motion. In contrast, DeJesus' other theories of ineffective assistance implicate his original counsel's handling of the case at the change-of-plea stage. If DeJesus prevailed on either of these claims, he would be entitled as a matter of right to the reinstatement of his original not guilty pleas. *See* Alaska R.Crim.P. 11(h)(1)(ii)(aa) (manifest injustice warranting withdrawal of plea demonstrated whenever defendant denied effective assistance of counsel in entering the plea).

indicates that counsel persisted in this mistaken belief until the change-of-plea hearing itself, at which time he was informed that attempted first-degree murder had recently been reclassified from a class A felony to an unclassified felony and, as such, was subject to a maximum term of ninety-nine years' imprisonment.

Admittedly, counsel's deposition testimony on this issue was not entirely unequivocal, leaving room to speculate that his mistaken understanding of the maximum term might have been corrected at some hearing other than—and prior to—the change-of-plea hearing. But at the first phase of the post-conviction relief process, resolution of factual disputes is not involved; the sufficiency of the pleadings must be assessed by viewing the application and all factual information incorporated therein in the light most favorable to the applicant. Viewed in the light most favorable to DeJesus' claim, his counsel's deposition testimony supports DeJesus' allegation that his attorney led him to believe that, if he changed his pleas to no contest, his maximum exposure on the attempted murder charge could not exceed the twenty-year maximum for a class A felony.

Moreover, the record of the original sentencing hearing confirms counsel's deposition testimony. The record establishes beyond question that counsel arrived at the sentencing hearing under the mistaken impression that first-degree murder was punishable by no more than twenty years' imprisonment. When Judge Steinkruger apprised DeJesus of the maximum terms for his offenses (twenty years for first-degree escape and ninety-nine years for attempted first-degree murder, for a total of one-hundred-nineteen

years), and asked him if he understood, the following occurred:

> DeJesus: (Inaudible reply).
>
> The Court: Mr. [Defense counsel]?
>
> [Defense counsel]: Sure. As to the escape, we are—he understands the maximum there. Last week, [the prosecutor] and I chatted about the maximum for the attempted murder, and he informed me it was ninety-nine, and that's what I relayed to Mr. DeJesus. But yesterday, *when I checked the statute before talking to Mr. DeJesus again,* I couldn't find where it said ninety-nine. *I believe it to be twenty.*
>
> [Prosecutor]: The ...
>
> [Defense counsel]: But, could be wrong.
>
> [Prosecutor]: The bill that increased the penalty for attempted murder in the first degree to ninety-nine years just became effective, I believe, the 26th of August of this year—1988. And—so, the legislature raised it effective the 26th of August. That's why it's ...
>
> [Defense counsel]: If that be the case, then that be the case.
>
> The Court: All right. Mr. DeJesus, do you understand the maximum which is set forth?
>
> DeJesus: Yes, Your Honor.

[Emphasis added.]

This exchange lends credence to the deposition testimony of DeJesus' original attorney and supports DeJesus' claim of misadvice as to the sentencing framework within which his case would be decided.[10]

The constitutional standard for effective assistance of counsel is one of minimal com-

---

10. In two respects, the transcript of the change-of-plea hearing indicates that counsel's subsequent deposition testimony may have been in error. First, the transcript does not support counsel's recollection at the deposition that he conferred with DeJesus after being apprised of the correct sentencing range for attempted first-degree murder. The transcript reveals that no consultation occurred.

Second, counsel's statements in the transcripts indicate, somewhat ambiguously, that at some point before the hearing he "relayed" informa-

tion to DeJesus that the maximum sentence for attempted first-degree murder was ninety-nine years. In this regard, however, counsel went on to say that, "before talking to Mr. DeJesus again," counsel had convinced himself that his original (mistaken) belief was correct. Assuming that the correct information counsel at some point "relayed" to DeJesus reached him, it seems clear that, by the time of the sentencing hearing, DeJesus had again been advised of the incorrect information.

petence. To be competent, an attorney's conduct must merely fall "within the range of reasonable actions which might have been taken by an attorney skilled in the criminal law[.]" *Risher v. State,* 523 P.2d 421, 424 (Alaska 1974). While the range of competence among practitioners may be broad, we think it virtually inconceivable that an attorney skilled in the criminal law could reasonably allow a client to enter a guilty or no contest plea to a criminal charge, particularly an unclassified felony, without first accurately explaining the maximum penalty that the client might face and the range of penalties that appeared realistically possible. Yet DeJesus' application for post-conviction relief specifically alleges, and the record in the present case strongly suggests, that DeJesus' original counsel may have done just that.

In the face of such a showing, it is insufficient to argue, as does the state, that the superior court informed DeJesus of the maximum penalty and that DeJesus indicated that he understood it before the court accepted his plea. DeJesus' complaint is not that the court failed to advise him of the maximum sentence but that his counsel failed. The distinction is significant. By failing to make clear to a client the maximum term the client faces upon the entry of a guilty or no contest plea, an attorney deprives the client of any opportunity to obtain counsel's advice concerning the advisability of entering such a plea in light of the potential penalty that might result therefrom.

Here, for example, the record indicates that DeJesus' counsel may have advised DeJesus as to the likely range of penalties he faced based on counsel's assumption that attempted murder was a class A felony. When counsel learned for the first time at the change-of-plea hearing that attempted first-degree murder was an unclassified felony with a maximum penalty seventy-nine years longer than he had believed it to be, counsel's

duty, in our view, was to ensure that DeJesus understood, not just the bare fact of what the maximum was (the fact independently communicated by the court), but also the potential consequences of that fact in the real-life setting of DeJesus' case.

There can be little doubt here that the court adequately made known to DeJesus the fact that he faced a maximum penalty of ninety-nine years for attempted murder. However, if, as the record indicates, DeJesus' attorney allowed his client to enter the originally contemplated no contest pleas with no opportunity for consultation as to the significance of the increased term, then there is equally little doubt that counsel deprived his client of effective representation—indeed of any representation at all—in connection with this new information. DeJesus was in effect left to his own counsel in evaluating whether and to what extent the newly disclosed maximum penalty might be important to his case.

For this reason, we conclude that the facts before the superior court at the time it dismissed DeJesus' application for post-conviction relief set forth a *prima facie* case that DeJesus' original counsel rendered ineffective assistance in advising DeJesus as to the potential sentence he might receive. We further conclude that the facts set forth in the record, if true, would suffice to create a reasonable doubt as to whether the ineffective assistance rendered by DeJesus' counsel contributed to DeJesus' ultimate decision to plead no contest. We think it reasonable to infer from the totality of the information before the superior court that DeJesus might have elected not to plead no contest had he been afforded the opportunity to discuss fully with counsel the potential significance of pleading no contest to an unclassified felony, rather than a class A felony. Accordingly, we hold that the superior court erred in dismissing DeJesus' post-conviction relief application.

## CONCLUSION

The superior court's orders denying DeJesus' motion to withdraw his no contest pleas and dismissing his application for post-conviction relief are VACATED. This case is REMANDED for further proceedings consistent with this opinion.[11]

MANNHEIMER, J., not participating.

11. Our disposition on these issues makes it unnecessary to consider DeJesus' sentencing arguments.