STATE OF NEBRASKA, APPELLEE,
V. MICHAEL T. JACKSON, APPELLANT.
582 N.W. 2d 317

Filed July 17, 1998.   No. S-97-522.

James C. Hart, Jr., for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

McCORMACK, J.

This case arises out of the shooting of two people in Omaha, Nebraska, for which appellant, Michael T. Jackson, was found guilty of first degree murder, attempted first degree murder, and two counts of use of a weapon to commit a felony. We review this case on direct appeal due to the imposition of a life sentence by a three-judge sentencing panel.

## I. BACKGROUND

Dionne Brewer, Jason Thornton, and Jackson were in Thornton's Chevrolet Blazer on February 4, 1996. Thornton picked up Brewer earlier in the day and went to pick up Jackson at his residence. Brewer had seen Jackson before and knew that his name was Michael but did not know his last name.

Upon picking up Jackson, the group had planned to fly to Minneapolis, Minnesota, to retrieve some cocaine, and Brewer was then to drive back to Omaha with it. Jackson and Thornton had agreed that Jackson owed Thornton approximately $11,500 for the purchase of a kilo of cocaine. Jackson did not want to fly with that much cash for fear it would be confiscated and encouraged the group to drive to Minneapolis. Thornton then told Jackson to forget the deal.

After dropping Jackson off, Thornton and Brewer discussed driving up and back to retrieve the drugs from Minneapolis. Thornton then called Jackson to inform him that they had changed their minds and were going to drive to Minneapolis. Thornton and Brewer packed some clothes, stopped at a store, and then picked up Jackson again. Jackson entered the Blazer with a black bag and announced that he had smoked some marijuana and was high. The three then went to look for a rental car that Jackson had purportedly rented for the drive to Minneapolis.

The group stopped at Brewer's cousin's house, where Jackson said his girl friend lived; however, she was not there. Brewer began to get irritated with Jackson for wasting time. Jackson claimed that he knew where he was going and that the three should turn onto Redmond Street, where the car was parked. Thornton stopped near a car on the street and began to get out of the Blazer when Brewer heard shots being fired. Brewer turned to see Jackson in the back seat, leaning forward, firing bullets into Thornton.

Brewer leapt from the vehicle and began to run down the street, screaming. Jackson began to pursue her, firing several shots at her. After being struck by a bullet, Brewer fell to the ground, still screaming for help. Jackson came over to Brewer while she still lay on the ground and shot her again. Brewer fell silent after the shot grazed her face. Jackson shot her one more time in the shoulder before leaving the scene. Brewer played dead for a while longer before going to one of the homes along the street to call police. When the police interviewed Brewer, she identified the shooter as someone whose last name she did not know, but whose first name was Mike, and who was wearing blue jeans, a dark stocking cap, and a tan jacket. Brewer told the officers that Jackson lived in a blue, two-story house with a white trim fence, which house was located on the north side of Saratoga Street, one block west of Fontenelle Boulevard and the second house from the end of the block.

Ella R. Iler, in front of whose home the shooting took place, heard what she thought was a truck backfiring, looked out her kitchen window, and saw a male standing over a person lying in the street, shooting that person. She said she heard three shots.

Iler said the shooter had on a dark knit hat, a light tan or beige coat, and dark trousers.

Officer Bruce M. Ferrell, after interviewing Brewer at University Hospital, drove to the area of 43d and Saratoga and identified the house from Brewer's description.

Demeteria Gardner testified that she had been dating Jackson at the time of the shooting and that Jackson had lived at his mother's house at 4344 Saratoga Street in Omaha. She further testified that she owned a green Plymouth Sundance, which Jackson was free to use. Gardner testified that Jackson borrowed the car on the night in question. She stated that he later returned and stayed for approximately 1½ hours before leaving. The police arrived a few hours later and asked Gardner's permission to search the Sundance. She consented and signed a form indicating such.

Once the house was located, Officer William Dussetschleger of the Omaha Police Division was assigned to maintain surveillance on the house at 4344 Saratoga Street until a warrant could be secured. Once the officers arrived with the warrant, Dussetschleger was instructed to search the Sundance that was parked in a driveway behind the house. Dussetschleger was instructed to particularly look for weapons and clothing, especially a tan jacket, tan shirt, and blue jeans. Upon opening the hatch area of the car, he found a black gym bag, inside of which were a tan coat, a pair of jeans, and tan workboots. Dussetschleger then got two other officers to assist in the search of the car. When the coat was checked more closely, red smudges were found on it.

Ferrell testified that he and other officers from the Omaha Police Division arrived at 4344 Saratoga Street, were admitted into the house by a woman, and then encountered Jackson. Jackson was taken for questioning to central police headquarters while a search warrant was obtained. Ferrell stated that a number of items were seized with the warrant, including a blue stocking cap, some rounds of ammunition for a handgun, and a green handgun pouch. Ferrell also took several of the items seized to the University of Nebraska Medical Center (UNMC) for forensic testing.

Dr. Blaine Roffman, the forensic pathologist who conducted the autopsy on Thornton, testified that Thornton died of two gunshot wounds to the neck, one of which exited the face, causing multiple fractures. One of the bullets severed the brain stem, which resulted in Thornton's quick death.

Barb McCue, a medical technologist at UNMC, and Dr. James Wisecarver, a pathologist at UNMC, described the type of deoxyribonucleic acid (DNA) analysis testing used by UNMC to provide help in solving crimes. McCue works under two directors, Dr. Ronald J. Rubocki and Wisecarver. She is certified by the College of American Pathologists and has been working with polymerase chain reaction (PCR) testing methods at UNMC since 1992. McCue identified a written copy of the lab's protocol and stated it described the procedure that the lab uses each time it performs DNA testing. She described the science that underlies the DNA testing, related the procedures used by the lab, and stated that she followed those procedures this time and each and every time a sample is tested for DNA. McCue gets the raw data and then gives it to her supervisor, Rubocki, who then reviews the data, checks the numbers again, and writes the report. The results obtained by McCue, exhibit 66, were received without objection. The protocol used, exhibit 5, was offered; an objection was made as to hearsay, not foundation; and the protocol was received into evidence. McCue then discussed the tests run in this particular case and concluded that the known blood sample from Thornton matched as a possible source for the blood on the jacket, shirt, and jeans seized from the bag found inside the Sundance.

Also testifying was Wisecarver, who has a Ph.D. degree from Creighton University in the field of physiology, has an M.D. degree from UNMC, did a residency in combined anatomic and clinical pathology, and is board certified in the field of anatomic and clinical pathology.

Wisecarver testified that he was involved with the creation of the testing protocols at UNMC. Beginning with the manuals that accompanied the testing equipment, Wisecarver made minor adjustments, making the process easier for UNMC's staff to use and allowing for reproducible results. Wisecarver further

testified that the specific protocol used by UNMC to conduct a particular method of PCR testing, called short tandem repeat (PCR STR), and PCR DNA testing in general were accepted in the relevant scientific community in the United States. Wisecarver then described his analyses in this case, the results of which eliminated Brewer as a source of the bloodstains upon Jackson's clothing; however, the reference sample from Thornton matched the samples taken from Jackson's clothing. Wisecarver then performed a statistical analysis of his findings, using the product rule and a computer database. The product rule is one technique used to determine the probability of finding a match between a DNA sample from a suspect and DNA material found in a body fluid sample recovered from a crime scene. See *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997). Wisecarver testified that this database exceeded the requirements of an empirical study performed by population geneticists. He testified that his statistical analysis provided that the odds of an African-American person, selected at random, possessing the same DNA markers would be 1.02 billion to 1.

During the testimony of Roffman, Jackson objected to the admission of certain autopsy photographs depicting the condition of Thornton's body. The trial court overruled this objection and allowed the photographs into evidence.

At the end of the State's case in chief, Jackson moved for an order dismissing the criminal information based upon the failure of the State to prove the elements of first degree murder, namely, that the State had failed to prove premeditation. This motion was overruled as well.

The defense presented no evidence, and the jury found Jackson guilty on all counts. Following the verdict, Jackson filed a motion for new trial. Jackson put on evidence in the form of testimony from two witnesses who alleged that a newspaper article regarding the trial was shown to a juror during a recess. Jackson's mother, Gearlean Jackson, testified that she saw one of the victim's family members show a newspaper article regarding Jackson and the trial to an older African-American juror who was having a cigarette during a recess. Jackson's aunt, Ruth Howard, corroborated the testimony of Gearlean Jackson. Gearlean Jackson could not testify as to what newspa-

per was shown to the juror. Howard could not testify as to what newspaper was shown to the juror but stated that she saw the juror read the newspaper. The State called Johnny Marks, Jr., one of two African-American males on the jury and the man identified by the defense as the juror spoken to about the newspaper. Marks testified that he did not read any articles about the case during the trial, that he always stayed in the jury room during the morning recesses, and that he did not smoke. The trial court overruled this motion as well.

A three-judge panel sentenced Jackson to life imprisonment on count I (first degree murder), 25 years' imprisonment on count III (attempted murder in the first degree), and 20 years' imprisonment each on counts II and IV (use of a deadly weapon to commit a felony). The sentence on count II was to run consecutively to that on count I, with the sentence on count IV to run consecutively to that on count III, and the sentences on counts III and IV to run concurrently to those on counts I and II.

## II. ASSIGNMENTS OF ERROR

Jackson assigns that the trial court erred in denying Jackson's (1) motion to suppress evidence, (2) motion in limine which sought to suppress all testimony concerning DNA statistical results and testing, (3) objection during trial to the admission of certain photographs depicting the condition of the victim's body, (4) motion to dismiss made at the close of the State's case in chief, and (5) motion for new trial.

## III. STANDARD OF REVIEW

On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Arnold*, 253 Neb. 789, 572 N.W.2d 74 (1998).

The exercise of judicial discretion is implicit in determinations of relevancy, and the trial court's decision will not be reversed absent an abuse of discretion. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998). The admissibility of evidence is reviewed for an abuse of discretion where the Nebraska rules of evidence commit the evidentiary question at issue to the discretion of the trial court. *State v. Jacob, supra.* Judicial discretion is a factor involved in admissibility of evidence under Neb.

Evid. R. 402 and 403, Neb. Rev. Stat. §§ 27-402 and 27-403 (Reissue 1995). *State v. Jacob, supra.*

In determining whether a criminal defendant's motion to dismiss for insufficient evidence should be sustained, the State is entitled to have all of its relevant evidence accepted as true, the benefit of every inference that reasonably can be drawn from the evidence, and every controverted fact resolved in its favor. *State v. Kula,* 252 Neb. 471, 562 N.W.2d 717 (1997); *State v. Glantz,* 251 Neb. 947, 560 N.W.2d 783 (1997); *State v. McDowell,* 246 Neb. 692, 522 N.W.2d 738 (1994).

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Jacob, supra; State v. Kula, supra; State v. Severin,* 250 Neb. 841, 553 N.W.2d 452 (1996); *State v. McBride,* 250 Neb. 636, 550 N.W.2d 659 (1996).

## IV. ANALYSIS

### 1. MOTION TO SUPPRESS EVIDENCE SEIZED

Jackson filed a motion to suppress any evidence seized from the house at 4344 Saratoga Street and the Sundance due to his allegation that the affidavit providing the basis for the search warrant contained insufficient evidence to provide the magistrate with probable cause to issue the warrant. The trial court denied the motion to suppress. Jackson assigns said denial as error. As support for this assignment, Jackson offers only the proposition that plain error may be found on appeal when an error is plainly evident on the record and which prejudicially affects a litigant's substantial right, and, if uncorrected, would cause a miscarriage of justice or damage the integrity, reputation, and fairness of the judicial process. *State v. Keller,* 240 Neb. 566, 483 N.W.2d 126 (1992); *Maddux v. Maddux,* 239 Neb. 239, 475 N.W.2d 524 (1991); *State v. Nowicki,* 239 Neb. 130, 474 N.W.2d 478 (1991).

We have repeatedly held that in determining the sufficiency of an affidavit to show probable cause for the issuance of a search warrant, an appellate court looks to the totality of the circumstances. This means that if the circumstances set forth in the affidavit, including the veracity and basis of knowledge of per-

sons supplying hearsay information, indicate there is a fair probability that evidence of a crime may be found at the place described, the affidavit is sufficient. *State v. Swift,* 251 Neb. 204, 556 N.W.2d 243 (1996); *State v. Flores,* 245 Neb. 179, 512 N.W.2d 128 (1994).

The affidavit is sworn to by Ferrell and signed by Douglas County Judge Lyn V. White. Ferrell had interviewed Brewer following the shooting and had taken down information Brewer knew regarding the shooter, known to her as "Mike." Brewer described the general location and description of the house, from which the police located the house at 4344 Saratoga Street. Brewer's information about the location of the house was the result of her and Thornton's having earlier dropped off Jackson at this address. Brewer had also described to Ferrell the clothes worn by the shooter who had killed Thornton and shot her. Prior to the issuance of the warrant, officers had already been to 4344 Saratoga Street, and Jackson had consented to go with them to central police headquarters. While at 4344 Saratoga Street, officers had seen clothing that could match the clothes described by Brewer, specifically, the dark blue hat. The above information was contained in the affidavit of Ferrell in his application for the warrant. It clearly provides probable cause for the search of the home at 4344 Saratoga Street. The search of the Sundance was pursuant to a written consent of the owner of the vehicle.

However, a question was raised at argument regarding the findings of fact of the trial court in ruling on the motion to suppress. In *State v. Osborn,* 250 Neb. 57, 67, 547 N.W.2d 139, 145 (1996), this court held that "[h]enceforth, district courts shall articulate in writing or from the bench their general findings when denying or granting a motion to suppress. The degree of specificity required will vary, of course, from case to case." In the case at bar, the motion to suppress merely named the places which were searched and requested that items taken pursuant to the warrant be suppressed because "[t]he affidavit accompanying the request for the search warrant did not contain sufficient information to establish probable cause to believe a crime or evidence of a crime would be found at the Defendant's residence." In the order denying the motion, the trial court stated,

"[u]pon consideration, the Court finds that the affidavit and application for issuance of a search warrant contained sufficient facts from sources that under the circumstances were reliable so as to constitute the required probable cause for the issuance of the warrant." Jackson's motion to suppress asserts only that the affidavit was infirm. The court's finding that the affidavit provides sufficient probable cause to issue a warrant is a valid finding of fact under our holding in *State v. Osborn, supra*, and so does not preclude effective review by this court. Our review reveals no error in denying Jackson's motion to suppress evidence. For the above reasons, Jackson's first assigned error is without merit.

## 2. ADMISSION OF DNA EVIDENCE

Jackson filed a motion in limine to prevent the admission of any evidence regarding the DNA evidence linking the clothes found in Gardner's car to Thornton's blood. At the hearing on the motion in limine, testimony was given by Wisecarver and Rubocki. McCue did not testify. Wisecarver and Rubocki testified as to the procedures used by UNMC to retrieve, test, analyze, and interpret DNA evidence from crime scenes. The trial court determined that the State had met its burden of establishing all the required elements for admissibility of DNA testing results as mandated by *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994). McCue and Wisecarver testified at trial as to the PCR STR DNA evidence. Jackson again objected to the admission of DNA evidence at trial, and the objection was overruled by the trial court.

To determine whether DNA evidence is admissible, the trial court is to decide preliminarily, outside the presence of the jury, on the basis of the evidence before it (1) whether the witnesses on the DNA issue are experts in the relevant scientific fields; (2) whether the type of DNA testing used in the case under consideration is generally accepted by the relevant scientific community, including the accompanying statistical analysis; (3) whether the testing protocol used in the case under consideration is generally accepted as reliable if performed properly; (4) whether the test conducted properly followed the protocol; (5)

whether DNA analysis evidence is more probative than prejudicial under § 27-403; and (6) whether statistical probability evidence interpreting the DNA analysis results is more probative than prejudicial. See, *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997); *State v. Carter, supra.* Jackson argues that the DNA evidence in the instant case was not admissible because PCR STR DNA analysis is not generally accepted in the scientific community, there was no evidence at the *Frye* hearing that the test properly followed the laboratory's protocol, the probative value of the evidence was outweighed by its prejudicial effect, and the statistical analysis used was not generally accepted in the scientific community.

(a) PCR STR DNA Testing Generally Accepted

In response to Jackson's motion in limine, the State called Rubocki. Rubocki is a graduate-level instructor who is the author of numerous publications in the areas of DNA studies and histocompatibility of human genetics for purposes of human organ transplants. He testified that UNMC has been doing DNA testing for transplant purposes since 1991. Following a review of his curriculum vitae, the following dialog was had:

Q: [by the State] And because of your position and with your educational background and with — after attending the different conferences that you have with other scientists who are involved — and other companies that are involved in this particular testing process, and after having reviewed the literature, scientific journals that have to do with this particular testing process, do you have an opinion as to whether this process, itself, is accepted within the realm of the scientific community?

A: Yes.

MR. POEPSEL: Judge, object at this time. Lack of foundation

THE COURT: Overruled.

THE WITNESS: Yes, it's —

Q: (BY MR. KLEINE) What is that opinion?

A: That it's generally accepted without any problem by everybody who has a knowledge of what's going on in the

field. I have yet to talk to anybody who doesn't think PCR is reliable, accurate, precise.

Rubocki's testimony also clearly indicated that the STR typing test is generally accepted in the scientific community.

> Q: This particular method of PCR testing called STR, is that particular methodology generally accepted in the realm of the scientific community?
>
> A: Yes. That's been around several years now, and there is nothing unique about PCR STR versus any PCR.

Based on this evidence, we can only conclude that the trial court was correct in determining that the PCR STR DNA test used in the instant case was generally accepted within the scientific community. See *State v. Tankersley*, 191 Ariz. 359, 956 P.2d 486 (1998) (discussing admissibility of PCR DNA evidence).

### (b) Foundation and Laboratory Protocol

As a foundational matter, DNA evidence is not admissible unless the laboratory's testing protocol was properly followed. *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992). The technician, McCue, who actually performed the test in this case, did not testify at the *Frye* hearing. This procedure is acceptable only if the person who does testify has some personal knowledge that the protocol was actually followed, i.e., the witness observed the test being performed. Neb. Evid. R. 602, Neb. Rev. Stat. § 27-602 (Reissue 1995), specifically states that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter."

In this case, neither Rubocki nor Wisecarver established that he had personal knowledge as to whether McCue, the technician who performed the test, had actually followed the laboratory's protocol. When asked whether he had any personal knowledge as to whether McCue followed every step in the protocol, Wisecarver replied, "Other than I trust her." The trial court apparently believed that Rubocki's testimony concerning a "checklist" initialed by McCue was sufficient to indicate that Rubocki had personal knowledge that McCue followed protocol. However, the following colloquy from the record indicates to the contrary:

Q. Do you have any personal knowledge as to whether Miss McCue followed correct laboratory procedures?

A. She follows our protocols.

Q. Okay. But do you have any personal knowledge that she followed correct procedures in this case?

A. She follows them in every case. Those are the protocols.

Q. Okay. How do you know she followed correct procedures in this case? Is there some sort of a checklist that she went through and she presented to you?

A. Yeah. We have sheets here that you initial. Extraction DNA, she initialed it. It means she did the protocol for extracting DNA.

Another one would be DNA amplification. So she initialed that. She did a DNA extraction procedure, amplification procedure, and additional categories here like running gels, the different kinds of gels. So when she signed it off, basically there is a checklist so we know that she did these protocols for those particular steps.

That McCue initialed a checklist saying she performed certain procedures does not show that she followed the proper protocol when performing those procedures. Rubocki's testimony that McCue's initials "means she did the protocol for extracting DNA" is really a restatement of Rubocki's previous testimony that McCue "follows our protocols." In other words, because Rubocki assumes that McCue follows the protocol, her indication by checklist that she performed certain procedures would also satisfy Rubocki, or "mean" to Rubocki, that she also followed the correct protocol when performing the initialed procedures. The "checklist" was not received in evidence, is certainly not the best evidence, and was testified to only after significant prompting.

We held in *State v. Houser*, 241 Neb. 525, 546, 490 N.W.2d 168, 182 (1992), that "proving that [the testing laboratory] followed its own protocol when testing the samples . . . is part of the State's burden for foundation of the test results." Because the State failed to meet that burden at the *Frye* hearing in the instant case, the trial court's preliminary conclusion that the protocol was followed in the instant case was erroneous.

However, we believe the error was harmless beyond a reasonable doubt because McCue was called at trial and her trial testimony clearly indicates that she correctly followed the protocol.

It is true that this court held in *Houser* that "in connection with DNA evidence, the trial court is to preliminarily decide [the admissibility of DNA evidence] *outside the presence of the jury* . . . ." (Emphasis supplied.) 241 Neb. at 549-50, 490 N.W.2d at 184. The admissibility was to be so determined to avoid presenting improper evidence to the jury. *Houser, supra.* See, also, Nev. Evid. R. 103(3), Neb. Rev. Stat. § 27-103(3) (Reissue 1995). We also indicated that "the failure to grant a hearing outside the jury's presence as to the admissibility of the evidence" was not harmless error. *Houser*, 241 Neb. at 544, 490 N.W.2d at 181. In the instant case, however, a hearing was granted, and harmless error review is appropriate.

Jackson does not give any argument as to why the DNA evidence was more prejudicial than probative, so we decline to address the issue. Finally, as for Jackson's argument regarding the statistical evidence introduced in the instant case, which was calculated according to the product rule, our holding in *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997), is dispositive.

This assignment of error is without merit.

### 3. ADMISSION OF PHOTOGRAPHS

Jackson further assigns error to the admission of certain photographs depicting the body of Thornton during the autopsy. Jackson objected to the admission of the photographs at trial because he alleged they were gruesome and their potential prejudice outweighed their probative value. The photographs objected to were exhibits 55, 56, and 57, which were taken after the body had been cleansed, and are autopsy photographs showing entry and exit wounds of the bullets. Oddly enough, Jackson did not make a § 27-403 objection to far more graphic crime scene photographs.

In dealing with autopsy photos in murder trials, we have clearly held:

> In a homicide case, photographs of the victim, upon proper foundation, may be received in evidence for purposes of identification, to show the condition of the body,

to show the nature and extent of wounds or injuries, and to establish malice or intent. . . .

The autopsy photographs [of a murder victim's body] were admi[ssible] into evidence to establish the manner in which the victim was killed.

*State v. McBride*, 250 Neb. 636, 660, 550 N.W.2d 659, 676 (1996). In the present case, autopsy photographs of the victim were admitted to show the extent of Thornton's wounds and the manner in which they resulted in his death. The photographs were not inordinately gruesome, nor did their potential prejudice substantially outweigh their probative value in detailing the nature of the victim's injuries. The trial court clearly did not abuse its discretion in allowing the autopsy photographs into evidence.

### 4. DENIAL OF JACKSON'S MOTION TO DISMISS

Following the close of the State's case in chief, Jackson moved for a dismissal based upon his allegation that the State's evidence failed to prove that Jackson committed a premeditated act. Jackson cites no authority to support his contention that the State failed to establish premeditation.

In denying the motion to dismiss, the trial court stated:

[C]onsidering that there is no fixed amount of time necessary to form the premeditation in the mind of the perpetrator and even the evidence that he obviously had pointed the gun at the back of the head of the exiting victim and fired twice would frankly, in and of itself, be sufficient for a jury to find premeditation.

The ruling of the trial court clearly complies with our holding in *State v. McBride*, 250 Neb. at 662, 550 N.W.2d at 677, wherein we stated, "The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed." As the evidence indicated Jackson's clear intent to use a deadly weapon in causing Thornton's injuries, there was no abuse of discretion in refusing to direct a verdict in Jackson's favor.

## 5. Motion for New Trial

Following the jury's verdict finding Jackson guilty and prior to the imposition of his sentence, Jackson filed a motion for new trial. The basis for this motion was revealed by the testimony of Gearlean Jackson and Howard, who claimed that Marks had improperly been shown by a member of the victim's family a newspaper article which related to the trial. After taking the testimony of Marks, who denied any improper communication and denied reading the article, the trial court denied Jackson's motion for new trial.

We have previously held that in a criminal case, misconduct involving an improper communication between a nonjuror and a juror gives rise to a rebuttable presumption of prejudice which the State has the burden to overcome. *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993). However, we have also recently held that a criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial. *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997). In the present case, the evidence presented by Jackson cannot surmount the testimony of Marks that he did not read the article or even leave the jury room at the time of the alleged misconduct. As such, the testimony falls short of showing misconduct by a preponderance of the evidence. With this in mind, we need not concern ourselves with issues of burden shifting because no misconduct has been shown under the first part of the *Anderson* test.

Our holding in *Anderson* also specifically deals with alleged prejudice arising from newspaper articles allegedly read by jurors. In order for a verdict to be set aside because of the prejudicial effect of newspaper accounts on jurors, there must be evidence presented that the jurors read newspaper accounts and that the accounts were unfair or prejudicial to the defendant. *State v. Anderson, supra.* As Marks specifically denied reading the article in question, and as Jackson's family could not specifically relate whether Marks had read the article concerning Jackson, the defense showed neither misconduct nor prejudice.

As such, the trial court did not abuse its discretion in denying Jackson's motion for new trial.

## V. CONCLUSION

In light of the foregoing, the jury's guilty verdict and the life sentence imposed by the three-judge panel are affirmed. Although the State failed to meet its burden at the *Frye* hearing, the trial court's erroneous preliminary conclusion that the protocol was followed is determined to be harmless error beyond a reasonable doubt because McCue was called at trial and her testimony clearly indicates that she correctly followed the protocol in regard to the DNA testing. We find no error in the admission of the autopsy photographs. The trial court properly decided the issue of premeditation in denying Jackson's motion to dismiss. Finally, we find no clear error in the trial court's denial of Jackson's motion for new trial. Finding no error, we affirm the verdict of the jury and the sentence of the three-judge panel.

AFFIRMED.

WHITE, C.J., not participating.