275 Neb. 434
STATE OF NEBRASKA, APPELLEE,
v.
MICHAEL T. JACKSON, APPELLANT.
No. S-06-1041.
Supreme Court of Nebraska.
Filed April 18, 2008.
Paula B. Hutchinson for appellant.
Jon Bruning, Attorney General, and James D. Smith for appellee.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.
A jury convicted Michael T. Jackson of first degree murder, attempted first degree murder, and two counts of use of a deadly weapon to commit a felony. On direct appeal, we affirmed Jackson's convictions.[1] In Jackson's postconviction petition, he alleges (1) ineffective assistance of trial counsel, (2) ineffective assistance of counsel on appeal, and (3) prosecutorial misconduct. The district court overruled Jackson's petition. Jackson appeals. We conclude that none of his numerous assignments of error have merit.

I. BACKGROUND

1. THE CRIME
The facts of Jackson's underlying offense are set out in his direct appeal.[2] We briefly recount the facts necessary to provide context for Jackson's claims.
On February 4, 1996, Jackson met with Dionne Brewer and Jason Thornton to buy cocaine. They planned to travel from Omaha to Minneapolis to make the buy. Brewer and Thornton wanted to fly, but Jackson wanted to drive because he was concerned about flying with $11,500 in cash. Brewer and Thornton agreed to drive and picked Jackson up in Thornton's vehicle, but Jackson suggested that they make the trip in a car that he had rented.
Jackson then gave Thornton, the driver, instructions to drive to where the rental car was parked. Jackson, who purported to be under the influence of marijuana, repeatedly led the trio astray. Brewer grew impatient and urged Jackson to stop wasting time. Jackson then directed Thornton to the location where he said he had parked the rental car. When they arrived at the location, Thornton stopped near a car Jackson identified as the rental car. As Thornton opened the driver's-side door to get out, gunshots rang out and Brewer saw Jackson shooting at Thornton from behind.
Brewer leapt out of the vehicle and began running down the street. Jackson got out of the vehicle and shot Brewer. As she lay in the street, Jackson shot her several times in the head and torso. Ella R. Iler, a woman who lived on the street where the shootings occurred, heard the initial gunfire. She rushed to her kitchen window and observed Jackson shoot Brewer.
Brewer managed to survive by playing dead. When officers arrived, Brewer informed them that she did not know Jackson's last name, but that his first name was Mike and that she knew where he lived. Some officers went to the location Brewer provided, while others went to the home of Jackson's former girlfriend, Demeteria Gardner, now known as Demeteria Miller (Miller). Miller gave officers consent to search her vehicle, which was parked in front of Jackson's home. (Jackson had borrowed Miller's vehicle earlier that day.) In the vehicle, police found a duffelbag containing clothes matching the description of the clothing worn by the killer. The clothing also contained red stains. A test at the University of Nebraska Medical Center would later reveal that the stains came from Thornton's blood. Officers then obtained a warrant and entered Jackson's home, where they found Jackson. Police seized several items in the house, including two .38-caliber bullets, a gun case, and a knit cap matching the description of a cap worn by the shooter.

2. PRETRIAL MOTIONS AND THE TRIAL
Michael J. Poepsel represented Jackson at trial. Before trial, Poepsel moved in limine to suppress (1) physical evidence that officers recovered from Jackson's home and Miller's car, (2) statements that Jackson made to police, and (3) DNA evidence. The court overruled the motion regarding the physical and DNA evidence. The prosecution, however, agreed not to introduce Jackson's statements at trial.
Several doctors and technicians affiliated with the University of Nebraska Medical Center testified that the bloodstains on the clothing found in the vehicle came from Thornton.
At one point, Poepsel objected to the admission of autopsy photographs of Thornton's body. The court overruled the objection. Poepsel also renewed his objection to the items of physical evidence when the State offered them at trial. After the prosecution rested, Poepsel moved to dismiss because the State had failed to prove premeditation. The court overruled the motion. Poepsel then rested without presenting any evidence. The jury found Jackson guilty on all counts.

3. DIRECT APPEAL
On appeal, James C. Hart, Jr., represented Jackson. Hart did not argue ineffective assistance of trial counsel in his direct appeal. Instead, Hart argued that the district court erred in (1) admitting the items of physical evidence seized from Jackson's residence, (2) admitting DNA evidence regarding the substance on Jackson's clothing, (3) admitting the gruesome photographs of Thornton's body, (4) overruling Jackson's motion to dismiss for lack of evidence on premeditation, and (5) overruling Jackson's motion for a new trial because of jury contamination. We rejected these claims and upheld Jackson's convictions.[3]

4. POSTCONVICTION MOTIONS
Following his unsuccessful appeal, Jackson filed a postconviction motion. In his motion, Jackson alleged: (1) ineffective assistance of trial counsel, (2) ineffective assistance of appellate counsel, and (3) prosecutorial misconduct because the prosecution failed to provide potentially exculpatory evidence.
At the postconviction hearing, the State adduced testimony from Poepsel and Hart. Jackson adduced testimony from his mother; Miller; and Cindy Lee Welch-Brown, the mother of Jackson's nieces and nephews.
Poepsel testified that he met with Jackson regularly to discuss trial strategy. During these meetings, Jackson allegedly changed his story frequently. According to Poepsel, Jackson initially stated that he did not murder Thornton, then stated that he killed Thornton in self-defense, and then admitted to murdering Thornton. Poepsel testified that because Jackson admitted he killed Thornton and because of the DNA evidence, they changed strategy. Poepsel testified that he and Jackson would focus the defense on ensuring a conviction of a lesser offense. Hart testified that while preparing an appeal in Jackson's case, he found nothing in the record that indicated a viable ineffective assistance of counsel claim.
The district court denied Jackson's motion. On appeal, this court remanded with instructions that the district court enter a formal order with factual findings.[4] In response, the district court entered an order in which it made numerous factual findings and conclusions of law. Notably, the court credited Poepsel's and Hart's testimony over the testimony of Jackson, Jackson's mother, and Welch-Brown.

II. ASSIGNMENTS OF ERROR

1. ASSIGNMENTS REGARDING TRIAL COUNSEL
Jackson assigns on appeal, restated, that the court erred in failing to find that Jackson received ineffective assistance of trial counsel. Regarding this assignment, Jackson argues that trial counsel failed to (1) present Miller's testimony, (2) present Welch-Brown's testimony, (3) refute and undermine Iler's testimony, (4) undermine the State's use of the bullets and gun case found in Jackson's home, (5) obtain and present evidence of the gunshot residue analysis, (6) depose a University of Nebraska Medical Center medical technologist and undermine her testimony at trial, (7) consider and present testimony by a forensic pathologist, (8) effectively rebut Brewer's testimony, (9) present evidence that fingerprints found at the crime scene did not match Jackson's prints, (10) develop a clear trial strategy, and (11) subject the State's case to meaningful adversarial testing.

2. ASSIGNMENTS REGARDING APPELLATE COUNSEL
Additionally, Jackson assigns that the court erred in failing to find that Jackson received ineffective assistance of counsel on direct appeal. He claims Hart was ineffective because of (1) an alleged conflict of interest stemming from Hart's personal relationship with Poepsel, Jackson's trial counsel, and (2) Hart's failure to argue on direct appeal that Poepsel was ineffective in the particulars listed above.

3. ASSIGNMENT REGARDING THE PROSECUTION
Jackson assigns that he was deprived a fair trial because the State failed to disclose potentially exculpatory evidence.
4. ASSIGNMENTS REGARDING DISCOVERY MOTIONS
Jackson assigns that the court erred when it denied the following discovery requests: (1) evidence found in a search of a drug kingpin's jail cell, (2) Brewer's drug abuse history, and (3) gunshot residue testing, either by a court-appointed expert or at Jackson's own expense.

III. STANDARD OF REVIEW
[1-5] A defendant requesting postconviction relief must establish the basis for such relief, and the district court's findings will not be disturbed unless they are clearly erroneous.[5] A claim that defense counsel provided ineffective assistance presents a mixed question of law and fact.[6] We review ineffective assistance of counsel claims under the two-prong inquiry mandated by Strickland v. Washington.[7] Under this inquiry, we review the lower court's factual findings for clear error.[8] Whether counsel's performance was deficient and whether that deficiency prejudiced the defendant are legal determinations that we resolve independently of the lower court's decision.[9]

IV. ANALYSIS

1. ALLEGED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL
[6-9] On appeal, Jackson argues that he received ineffective assistance from his trial attorney. The State argues that Nebraska's procedural default rule bars Jackson's claim. Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law.[10] When reviewing a question of law, we resolve the question independently of the lower court's conclusion.[11] A party cannot raise an issue in a postconviction motion if he or she could have raised that same issue on direct appea1.[12] So a motion for postconviction relief asserting ineffective assistance of trial counsel is procedurally barred when (1) the defendant was represented by a different attorney on direct appeal than at trial, (2) an ineffective assistance of trial counsel claim was not brought on direct appeal, and (3) the alleged deficiencies in trial counsel's performance were known to the defendant or apparent from the record.[13]
A different attorney, Hart, represented Jackson on his direct appeal. Jackson did not allege ineffective assistance of counsel as part of his direct appeal to this court.[14] All of Jackson's allegations regarding trial counsel's deficient performance would either have been apparent to Jackson at the time of appeal or would have been apparent from the record. As such, Jackson is prohibited from claiming that he received ineffective assistance of trial counsel in his postconviction motion under the procedural default rule.

2. ALLEGED INEFFECTIVE ASSISTANCE OF DIRECT APPEAL COUNSEL
Jackson argues that he received ineffective assistance from Hart, his appellate counsel. He claims Hart failed to argue that his trial attorney, Poepsel, provided ineffective assistance. Jackson also argues that Hart was ineffective because of a close personal relationship with Poepsel. Jackson claims that this relationship presented a conflict of interest and kept Hart from arguing that Poepsel was ineffective at trial.

(a) Alleged Conflict of Interest
[10-12] A conflict of interest which adversely affects a lawyer's performance violates the client's Sixth Amendment right to effective assistance of counsel.[15] In cases of such a conflict, there is no need to show that the conflict resulted in actual prejudice to the defendant, showing an actual conflict existed is sufficient.[16] Ordinarily, such a conflict arises when an attorney is representing multiple defendants.[17] This court, however, has previously defined "actual conflict" broadly. The term therefore encompasses any situation in which a defense attorney faces divided loyalties such that regard for one duty tends to lead to disregard of another.[18]
The district court found no conflict of interest. It specifically found that Jackson was not credible in testifying that Hart adjusted his appeal strategy based on his alleged relationship with Poepsel. The court determined that no friendship or personal relationship existed between the two attorneys. Jackson fails to point to evidence which might show that Poepsel and Hart had a personal relationship. We will not disturb the district court's conclusions unless they are clearly erroneous.[19] Jackson failed to show that the district court erred in concluding that Poepsel and Hart had no personal relationship.

(b) Failure to Argue Ineffective Assistance of Trial Counsel on Direct Appeal
Jackson next argues that he received ineffective assistance of counsel on direct appeal because Hart failed to assign and argue that Jackson received ineffective assistance of counsel at trial. Because Jackson's postconviction motion was his first opportunity to raise this claim, it is not procedurally barred.[20]
[13-16] We analyze Jackson's claim that he received ineffective assistance of appellate counsel in violation of the Sixth Amendment under the two-prong test set forth in Strickland v. Washington.[21] Under Strickland, Jackson has the burden to show that (1) counsel performed deficientlythat is, counsel did not perform at least as well as a criminal lawyer with ordinary training and skill in the area, and (2) this deficient performance actually prejudiced him in making his defense.[22] The prejudice prong requires that Jackson show a reasonable probability that but for counsel's deficient performance, the result of the proceeding in question would have been different.[23] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[24] Notably, we can assess the prongs in either order.[25]
[17,18] When analyzing a claim of ineffective assistance of appellate counsel, courts usually begin by determining whether appellate counsel failed to bring a claim on appeal that actually prejudiced the defendant. That is, courts begin by assessing the strength of the claim appellate counsel failed to raise.[26] Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appea1.[27] When, as here, the case presents layered ineffectiveness claims, we determine the prejudice prong of appellate counsel's performance by focusing on whether trial counsel was ineffective under the Strickland test.[28] If trial counsel was not, then the defendant suffered no prejudice when appellate counsel failed to bring an ineffective assistance of trial counsel claim.
[19] If trial counsel was ineffective, then the defendant suffered prejudice when appellate counsel failed to bring such a claim. We must then consider whether the appellate counsel's failure to bring the claim qualifies as a deficient performance under Strickland. In other words, whether the claim's merit was so compelling that appellate counsel's failure to raise it amounted to ineffective assistance of appellate counse1.[29] If it was, then the defendant suffered ineffective assistance of appellate counsel. If it was not, then the defendant was not denied effective appellate counsel.
[20-22] Thus, although Jackson's claim that he received ineffective assistance of trial counsel is procedurally barred, we address the issue to determine whether he received ineffective assistance of appellate counsel. In assessing trial counsel's performance under Strickland's two-prong test, there is a strong presumption that Poepsel acted reasonably.[30] This court has previously stated that trial counsel is afforded due deference to formulate trial strategy and tactics.[31] As such, when reviewing an ineffective assistance of counsel claim, we will not secondguess reasonable strategic decisions made by counse1.[32]

(i) Trial Counsel Was Not Ineffective for Failing to Present Miller's Testimony
Jackson argues that Poepsel was ineffective for failing to investigate and present evidence by Jackson's former girlfriend, Miller. Jackson claims that he told Poepsel that Miller would provide an alibi. Miller would testify that Jackson was at Miller's home around the time the shooting occurred. Moreover, Jackson claims that had Poepsel inquired, Miller would have testified that Jackson did not have blood on his clothing.
Regarding the alibi theory, Miller testified for the postconviction hearing that Jackson came to her residence around 9 o'clock on the night of the shootings. She stated that he stayed anywhere from 45 to 90 minutes. But other evidence undermines Miller's alibi testimony.
The evidence shows the shooting was reported to the police dispatcher around 8:33 p.m. and Jackson appeared at Miller's residence around 9 or 9:15 p.m. Miller also testified that Jackson was wearing the same clothestan jacket, tan shirt, jeans, and a knit hatthat she had seen him wearing hours before. However, the distance between the location where the shooting occurred and Miller's house is about 1.8 miles. Obviously, Jackson would have had ample time to travel from the scene of the shooting to Miller's house in the 30-plus minutes that elapsed between the shooting and Jackson's arrival at Miller's home. Thus, Miller's testimony that Jackson arrived at her residence around 9 p.m. would not have provided Jackson with an alibi.
Jackson also claims that Poepsel was ineffective for failing to elicit testimony from Miller whether she observed blood on Jackson's clothing that night. In a deposition taken after the trial, Miller stated that she did not see any blood on Jackson's clothing. Poepsel conceded that he did not ask Miller about this when preparing for trial. But the stain consisted of a few light smudges near the coat's bottom edge, toward the back. Miller's testimony that she did not see blood on Jackson would not have shown that it was not there. She could have simply failed to notice the stain or failed to recognize that the stain was blood. She specifically testified that she would not have been looking at the back of his coat and did not know if there even had been an opportunity for her to see it. So Miller's testimony would not have conflicted with DNA evidence linking the victim's blood to Jackson's coat. We conclude that Jackson has failed to show a reasonable probability that eliciting Miller's testimony would have changed the outcome. Thus, Poepsel's failure to present Miller's testimony did not prejudice Jackson.

(ii) Trial Counsel Was Not Ineffective for Failing to Present Welch-Brown's Testimony
Jackson argues that Poepsel was ineffective for failing to present potentially exculpatory testimony from Welch-Brown. Welch-Brown is the unwed mother of children born to Jackson's brother. Jackson claims that Welch-Brown would also have provided an alibi. Welch-Brown, who lived at the Jackson residence, told police that she briefly saw Jackson there at about 9 o'clock on the evening of the shooting.
The Jackson residence is one-half mile southeast of where the shooting occurred. Obviously, Jackson would have had time to cover that distance in the approximate one-half hour between the shooting and when Welch-Brown saw Jackson. Welch-Brown's testimony leaves Jackson with a loose-fitting alibi. He ignores that Welch-Brown's testimony places him a few blocks from the murder scene with 30 to 45 minutes unaccounted for. So, Miller and Welch-Brown's testimony does nothing to refute the possibility that Jackson could have traveled the short distance to his home, stayed there briefly, then traveled the 1.65 miles to Miller's residence. Poepsel's failure to present Welch-Brown's testimony did not prejudice Jackson.

(iii) Trial Counsel Was Not Ineffective for Failing to Undermine Ilea's Testimony
Jackson argues that Poepsel was ineffective for failing to focus the jury's attention on Iler. He contends Poepsel should have emphasized that Her (1) testified the shooter wielded a gun in his left hand even though Jackson is right handed, (2) initially told police that the shooter wore lime-green pants, and (3) could not identify Jackson as the shooter when shown a photographic lineup.
Poepsel concedes that he did not ask Jackson whether he was right handed or present such evidence to the jury. The question is whether Poepsel's failure to do so prejudiced Jackson's defense.
As Poepsel stated at his deposition, he did not believe Iler's testimony was critical because the State had DNA evidence linking the victim's blood to the clothing recovered from a vehicle used by Jackson. Miller testified that she saw Jackson wearing the same jacket within one-half hour of the shootings. Finally, one of the victims, Brewer, testified that Jackson shot Thornton from the back seat of the vehicle she was riding in and then chased her down the street. In light of such rockhard evidence, it is unlikely that Iler's belief that the shooter was left handed would have impressed the jury. Poepsel's failure to specifically undermine Iler's testimony did not prejudice Jackson.

(iv) Trial Counsel Was Not Ineffective for Failing to Object to .38-Caliber Bullets
Jackson argues that Poepsel was ineffective in allowing the State to introduce two .38-caliber bullets and a gun case that police found while searching Jackson's bedroom. Poepsel did file a pretrial motion seeking to suppress the items, ostensibly because they were seized illegally. The trial court denied the motion. Poepsel renewed this motion at trial, which the court overruled. Jackson now argues that Poepsel also should have objected to the evidence on relevancy grounds. Specifically, Jackson argues that the police reports show that the .38-caliber bullets recovered from Jackson's house do not match the bullet fragments found at the scene.
The police reports show that officers compared bullet fragments test-fired from a .44-caliber handgun with the bullet fragments recovered from the crime scene. The record does not reflect why this test was performed. But the police report was inconclusive as to whether the .44-caliber ammunition matched the bullet fragments at the scene. Inconclusive means that the police could not conclude the killer used a .44-caliber handgun in the shootings of Thornton and Brewer.
Obviously, an inconclusive comparison between the fragments recovered from the test-fired .44-caliber bullets and the fragments at the scene does nothing to disturb the inference that Jackson used a .38-caliber gun to commit the crime. Only a conclusive match would have supported Jackson's claim that the .38-caliber bullets were irrelevant. As such, in contrast to Jackson's claims, there is no inherent inconsistency in admitting the .38-caliber bullets found in Jackson's home. Because we conclude Poepsel was not ineffective, Hart was not ineffective for failing to raise the above issues.

3. PROSECUTION'S ALLEGED FAILURE TO DISCLOSE POTENTIALLY EXCULPATORY EVIDENCE
Jackson next argues that he is entitled to a new trial because the prosecution failed to disclose potentially exculpatory evidence. Specifically, Jackson points to four police reports in which several members of a drug conspiracy indicated that Donald Hughes, the conspiracy's ringleader, wanted Thornton killed. Thornton apparently owed a large debt to Hughes, and as a result, Hughes ordered Thornton's murder.
In the report, Andrew Adams, an inmate at the Douglas County Correctional Center, overhead a telephone conversation between Hughes and an individual named "Jason," which is Thornton's first name. An argument ensued during which Hughes demanded repayment of money and threatened "Jason." Adams stated that "Jason" hung up on Hughes. Hughes then retrieved a telephone number from his jail cell and placed a call to an individual identified as "Mike," a derivative of Jackson's first name. Adams overheard Hughes direct "Mike" to "go ahead and take care of that business." After getting off the telephone, Hughes allegedly explained to Adams that he had fronted Thornton cocaine which Thornton had refused to pay for. Thornton was shot and killed shortly thereafter. Days later, Hughes and Adams were watching a news report about the shooting death of Thornton, after which Hughes told Adams, "I told you that's how I take care of business, I told you he would be buried with it." Jackson argues that the prosecution's failure to disclose these reports violated his right to exculpatory evidence under the Due Process Clause and Nebraska statutory law.

(a) Due Process Analysis
[23-25] Under Brady v. Maryland,[33] a prosecutor who fails to turn over evidence "favorable to an accused upon request violates due process where the evidence is material . . . to guilt." The Court expanded this rule in United States v. Bagley.[34] Under Bagley, prosecutors have a duty to present material exculpatory evidence even if defense counsel never requests the evidence.[35] Favorable evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.[36] A reasonable probability of a different result is shown when the State's evidentiary suppression undermines confidence in the outcome of the tria1.[37] This standard is identical to the prejudice prong of the Strickland test for ineffective assistance of counsel.[38]
Poepsel testified that he did not see the reports before trial. The question is whether the State's failure to supply Poepsel with the four police reports violated Jackson's due process rights. The reports contain statements indicating that Jackson was one of several individuals who bought and sold drugs from a kingpin named "Hughes." They indicate that Hughes called a man named "Mike" and ordered him to "'take care of that business," referring to Thornton, and that Thornton was shot and killed a day later. The only other individual named "Michael" in Hughes' circle of drug dealers was incarcerated in the Douglas County Correctional Center along with Hughes when the shootings occurred.
Although Jackson claims that these reports open up the possibility that another individual named "Mike" was hired to kill Thornton, he ignores that the reports strongly suggest that Hughes hired Jackson to kill Thornton. As such, the reports not only fail to exculpate him, they provide the State with a motive.
Beyond the reports, Jackson repeatedly refers to the possibility that a search of Hughes' jail cell may have revealed a telephone number to other individuals, any of whom may have been the individual Hughes ordered to kill Thornton. Such evidence would have been more likely to be material under Bagley than the police reports themselves. But there is no evidence that the police found any telephone numbers when they searched Hughes' cell. The police report shows that police conducted a search of Hughes' cell; however, there is no indication that they found any useful information.

(b) Statutory Analysis
[26] Jackson also claims that the prosecution's failure to disclose the police reports violated his right to exculpatory evidence under Nebraska statutory law. In State v. Castor,[39] we held that Nebraska's disclosure statute[40] is more exacting than federal due process requirements. In particular, we held that
whether a prosecutor's failure to disclose such evidence results in prejudice to the accused "depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal."[41] The standard under § 29-1912 for exculpatory evidence is slightly different from the due process standard announced in Bagley. Both standards require a showing that the nondisclosure prejudiced the defendant by preventing him or her from acquiring material evidence. Nebraska law, however, defines materiality more broadly to apply to evidence which strongly indicates it would play an important role in preparing a defense.[42] Brady did not focus on the defendant's ability to prepare for trial, because Brady was not a rule for discovery.[43]
It is plausible that having the police reports at trial might have prompted Jackson to request production of any telephone numbers or other evidence the police obtained from their search of Hughes' jail cell. If true, then arguably, the police reports would have played an important role in uncovering admissible evidence. Yet, Jackson has not shown that the police recovered any such evidence from Hughes' cell. So while disclosure of the police reports may have piqued Jackson's interest in any evidence found in Hughes' cell, at present, the record fails to show that officers did, in fact, find anything useful to Jackson's case. So Jackson has failed to carry his burden to show that the State withheld any material exculpatory evidence.

4. ALLEGED ERRONEOUS RULINGS BY TRIAL COURT
Related to Jackson's claim of prosecutorial misconduct is Jackson's postconviction request that the district court compel the State to produce (1) evidence the police might have found in the search of Hughes' jail cell and (2) records of Hughes' telephone calls and visitors while he was in the Douglas County Correctional Center. Jackson believes that this information may uncover evidence that Hughes called or was visited by the individual whom he hired to kill Thornton. If true, Jackson believes that such information might strengthen his claim of prosecutorial misconduct and ultimately lead to a new trial.
[27] The State objected to Jackson's request on relevancy grounds, and the court overruled Jackson's motion. The trial court has broad discretion in granting discovery requests and errs only when it abuses its discretion.[44] Whether the court erred in denying Jackson's discovery request presents a more difficult issue than the propriety of the court's refusal to grant Jackson's request for a new trial.
[28,29] We believe the information Jackson sought to discover is relevant. We stated in State v. Oliva[45] that evidence is relevant if it tends in any degree to alter the probability of a material fact.[46] In other words, relevancy requires only that "the degree of probativeness be something more than nothing."[47] Evidence that Hughes may have been in contact with other individuals before Thornton was shot directly relates to the identity of the person he apparently hired to kill Thornton. Obviously, this is a material fact. Evidence that Hughes contacted other individuals makes it slightly more probable that one of those individuals was the shooter. More important, such evidence may well lead to other, more probative evidence. As such, this evidence is relevant.
Nevertheless, a question exists as to whether Jackson can request this evidence. In State v. Thomas,[48] we questioned whether a defendant could request discovery in a postconviction motion. We stated that we knew of no precedent that permits a defendant, in a postconviction proceeding, to request additional discovery which would facilitate making that same postconviction claim.[49] This suggests that the Nebraska Postconviction Act merely gives a defendant the right to present evidence he already possesses.[50] If true, then Jackson's requests would be barred.
But a procedural rule, which prevented prisoners from seeking any discovery at the postconviction stage, would make Nebraska unique among American jurisdictions. Numerous jurisdictions allow discovery requests at the postconviction stage so long as the request concerns relevant evidences[51] Other jurisdictions allow postconviction discovery more or less at the trial court's discretion.[52] A number of courts are more exacting and permit prisoners to seek discovery at the postconviction stage on a showing of good cause.[53] Montana and the federal government, by statute and rule, respectively, also require a showing of good cause for discovery at the postconviction stage.[54]
[30,31] The Nebraska Postconviction Act looks unfavorably on any attempts to rehash issues at the postconviction stage which wereor could have beenraised and disposed of at trial or on direct appea1.[55] Thus, prisoners cannot seek discovery at the postconviction stage if the requested evidence could have been obtained at trial. But when a postconviction discovery request is for evidence that the defendant would not have known to request until after the trial, the postconviction stage is the prisoner's first opportunity to make such a request.
Such a circumstance could exist when a prosecutor withheld evidence before trial that, although not exculpatory on its own, might have led to the defendant's discovery of exculpatory evidence. Perhaps there should be a limited exception to Thomas[56] for discovery requests concerning evidence which the prosecution withheld from the defendant at trial when there is a reasonable possibility that the requested evidence, if it exists, could have resulted in a different outcome at trial.
Nevertheless, the district court properly overruled Jackson's discovery request even assuming such an exception to Thomas. The best that Jackson could hope for with his discovery request is evidence that Hughes had information for a different "Mike" who was known to do contract killings for Hughes. But even in this best-case scenario, such evidence would not be able to overcome the direct proofDNA evidence and eyewitness testimonylinking Jackson to these crimes. As such, Jackson's prosecutorial misconduct claim would not have undermined confidence in the outcome even if he obtained the evidence he sought from the prosecution. Therefore, while we might allow an exception to Thomas in the future, this is not the case.

V. CONCLUSION
Jackson's claim that he received ineffective assistance of trial counsel is procedurally barred because he failed to raise that claim on direct appeal. Moreover, it appears that Jackson was not prejudiced by any of Poepsel's allegedly deficient actions at the trial stage. This forecloses the possibility that Hart, Jackson's appellate counsel, was ineffective for failing to bring an ineffective assistance of trial counsel claim on direct appeal.
Jackson's claim that his defense was prejudiced by the prosecution's failure to disclose several police reports is also meritless. Jackson has failed to provide any support for his belief that the prosecution had material evidence which it withheld from him. He also failed to show that having those police reports at the trial stage would have led to other material exculpatory evidence.
There is no merit to Jackson's claim that the district court abused its discretion when it denied Jackson's request for any evidence the police may have recovered regarding Hughes. While this information is relevant to Jackson's claim that he was the victim of prosecutorial misconduct, the result of Jackson's trial would not change even if Jackson was able to obtain and present the evidence he seeks from the prosecution. Therefore, the request was properly denied.
Finally, we have considered Jackson's other assignments of error and arguments and conclude that none of those issues have sufficient merit to warrant further discussion.
AFFIRMED.
HEAVICAN, C.J., not participating.
NOTES
[1] See State v. Jackson, 255 Neb. 68, 582 N.W.2d 317 (1998).
[2] Id.
[3] Jackson, supra note 1.
[4] State v. Jackson, 264 Neb. xxiv (No. S-02-366, Oct. 9, 2002).
[5] State v. Mata, 273 Neb. 474, 730 N.W.2d 396 (2007).
[6] See State v. Miner, 273 Neb. 837, 733 N.W.2d 891 (2007).
[7] Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).
[8] See State v. Gales, 269 Neb. 443, 694 N.W.2d 124 (2005).
[9] See, Miner, supra note 6; Gales, supra note 8.
[10] See State v. Marshall, 269 Neb. 56, 690 N.W.2d 593 (2005).
[11] See id.
[12] See id. (citing State v. Perry, 268 Neb. 179, 681 N.W.2d 729 (2004), and State v. Lotter, 266 Neb. 245, 664 N.W.2d 892 (2003)).
[13] See id. (citing State v. Al-Zubaidy, 263 Neb. 595, 641 N.W.2d 362 (2002); State v. Suggs, 259 Neb. 733, 613 N.W.2d 8 (2000); and State v. Williams, 259 Neb. 234, 609 N.W.2d 313 (2000)).
[14] See Jackson, supra note 1.
[15] See Mickens v. Taylor, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002).
[16] State v. Davlin, 265 Neb. 386, 658 N.W.2d 1 (2003).
[17] See, e.g., McFarland v. Yukins, 356 F.3d 688 (6th Cir. 2004).
[18] State v. Turner, 218 Neb. 125, 354 N.W.2d 617 (1984).
[19] Mata, supra note 5.
[20] See Marshall, supra note 10.
[21] Strickland, supra note 7.
[22] See State v. Molina, 271 Neb. 488, 713 N.W.2d 412 (2006) (construing Strickland, supra note 7).
[23] See Al-Zubaidy, supra note 13.
[24] Strickland, supra note 7.
[25] See State v. Benzel, 269 Neb. 1, 689 N.W.2d 852 (2004).
[26] McFarland, supra note 17.
[27] Id.
[28] See Williams, supra note 13. See, also, Al-Zubaidy, supra note 13.
[29] McFarland, supra note 17.
[30] See Al-Zubaidy, supra note 13.
[31] See id. (citing State v. Lindsay, 246 Neb. 101, 517 N.W.2d 102 (1994)).
[32] See id.
[33] Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).
[34] United States v. Bagley, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).
[35] See, State v. Lykens, 271 Neb. 240, 710 N.W.2d 844 (2006) (citing Bagley, supra note 34).
[36] See id.
[37] Id.
[38] See supra note 24 and accompanying text.
[39] State v. Castor, 257 Neb. 572, 599 N.W.2d 201 (1999).
[40] Neb. Rev. Stat. § 29-1912 (Reissue 1995).
[41] Castor, supra note 39, 257 Neb. at 585, 599 N.W.2d at 211 (emphasis omitted) (quoting State v. Kula, 252 Neb. 471, 562 N.W.2d 717 (1997)).
[42] See State v. Lotter, 255 Neb. 456, 586 N.W.2d 591 (1998)
[43] See State v. Brown, 214 Neb. 665, 335 N.W.2d 542 (1983).
[44] See State v. Thomas, 236 Neb. 553, 462 N.W.2d 862 (1990).
[45] State v. Oliva, 228 Neb. 185, 422 N.W.2d 53 (1988).
[46] See id.
[47] See id at 189, 422 N.W.2d at 55.
[48] Thomas, supra note 44.
[49] Id.
[50] Id.
[51] See, e.g., DeJesus v. State, 897 P.2d 608 (Alaska App. 1995); People v. Rodriguez, 914 P.2d 230 (Colo. 1996); Gibson v. U.S., 566 A.2d 473 (D.C. 1989); State v. Ferguson, 20 S.W.3d 485 (Mo. 2000); State v. Jensen, 333 N.W.2d 686 (N.D. 1983); State v. Ziebart, 268 Wis. 2d 468, 673 N.W.2d 369 (Wis. App. 2003).
[52] See, e.g., Marshall v. State, No. SCO5-2379, 2007 WL 4258618 (Fla. Dec. 6, 2007); Raudebaugh v. State, 135 Idaho 602, 21 P.3d 924 (2001); Varney v. State, 475 N.W.2d 646 (Iowa App. 1991); Corn. v. Daniels, 445 Mass. 392, 837 N.E.2d 683 (2005) (construing Mass. R. Crim. P. 30(c)) (2006).
[53] See, e.g., Ex parte Land, 775 So. 2d 847 (Ala. 2000); Dawson v. State, 673 A.2d 1186 (Del. 1996); Corn. v. Carson, 590 Pa. 501, 913 A.2d 220 (2006); Personal Restraint of Gentry, 137 Wash. 2d 378, 972 P.2d 1250 (1999).
[54] See, Stanford v. Parker, 266 F.3d 442 (6th Cir. 2001); Mont. Code Ann. § 46-21-201 (2007).
[55] See, e.g., State v. Luna, 230 Neb. 966, 434 N.W.2d 526 (1989); State v. Pratt, 224 Neb. 507, 398 N.W.2d 721 (1987); State v. Bean, 224 Neb. 278, 398 N.W.2d 104 (1986).
[56] Thomas, supra note 44.